# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **OFFICE DEPOT, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CASE NO:  1:09 CV 2791** |
| **vs.** | ) | |
| | ) | **JUDGE SOLOMON OLIVER, JR.** |
| **IMPACT OFFICE PRODUCTS, LLC,** *et al.* | ) | |
| | ) | |
| **Defendants.** | ) | |

---

### DEFENDANTS BRIAN KYLE'S AND PATRICK LAVELLE'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF AND EXTENSION OF THE TEMPORARY RESTRAING ORDER

---

H. Alan Rothenbuecher          (0041883)
  har@szd.com
Jay E. Krasovec                (0068787)
  jkrasovec@szd.com
Schottenstein Zox & Dunn Co., LPA
US Bank Centre at Playhouse Square
1350 Euclid Ave., Suite 1400
Cleveland, Ohio  44115
Phone:  (216) 621-6501
Facsimile:  (216) 621-6502

*Attorneys for Defendants*
*Brian Kyle and Patrick Lavelle*

{C0047414.2 }

**<u>Table of Contents</u>**

<u>Page</u>

I.      INTRODUCTION ..................................................................................... 1

II.     RELEVANT FACTS ............................................................................... 2

     A.     Kyle and Lavelle's Sales Experience Before Office Depot................................. 2

     B.     Kyle's and Lavelle's General Sales Functions at Office Depot and Lack of
          Any Specialized Training. ..................................................................... 3

          1.     Brian Kyle:.................................................................................3
          2.     Patrick Lavelle: ..........................................................................5

     C.     Office Depot's Lack of Safeguarding Measures & Ever-Changing Pricing........... 6

     D.     Industry Practices -- The Public Availability of Pricing and Customer
          Information and the Portability of Employees......................................... 8

          1.     Information Sharing in the Industry – there are no Secrets. .......................8
          2.     Office Depot allowed Similarly Situated former Employees to
              compete. ....................................................................................9

     E.     Kyle and Lavelle's Encouraged Departure to Work for an Independent
          Office Supply Company. ..................................................................... 10

     F.     Lapse of Time and Reliance upon Office Depot's Prior Actions. ........................ 11

III.    LAW AND ARGUMENT ............................................................................... 13

     A.     Standard for Issuance of a Preliminary Injunction. ............................................ 13

     B.     Office Depot Cannot Establish It Has a Strong Likelihood of Prevailing on
          the Merits. ....................................................................................... 14

          1.     The Breach of Contract Claim .................................................................14

              a)     Standard under Ohio Law for Enforcement of Non-
                  Competition and Non-Solicitation Provisions ............................. 14

              b)     Standard Under Florida Law for Enforcement of Non-
                  Competition and Non-Solicitation Provisions ............................. 15

              c)     Office Depot Has No Legitimate Interest to Protect
                  Through Enforcement of the Restrictive Covenants..................... 16

              d)     The Scope of the Restrictive Covenants is Overly Broad............ 22

e)     Reformation of the Defective Restrictive Covenants Is Not Mandatory ..................................................................................... 24

f)     Office Depot's Breach of Contract Claim is Barred by Laches. ...................................................................................... 25

g)     Office Depot's breach of contract is barred by waiver. ............... 26

2.     Office Depot Cannot Establish its Trade Secret Misappropriation Claim Because it Cannot Show Defendants Possess Trade Secrets. .........28

C.     Office Depot Will Not Suffer Immediate or Irreparable Injury if Injunctive Relief is Denied.................................................................................... 28

D.     The Issuance of Preliminary or Permanent Injunctive Relief Against Defendants Would Cause Substantial Harm to Defendants. ............................... 29

E.     The Issuance of Preliminary or Permanent Injunctive Relief against Defendants Would Not Serve the Public Interest .................................................. 30

F.     Office Depot Is Barred From Obtaining Equitable Relief by the Doctrine of Unclean Hands.................................................................................... 30

G.     Bond ................................................................................................ 31

IV.     CONCLUSION ........................................................................................... 31

**Table of Authorities**

**Cases**

*Aero Fulfillment Servs., Inc. v. Tartar* 2007 WL 120695 at *4 (2007 Ohio App. 1st Dist.) ........ 29

*Andrews v. Teachers Retirement Sys. Bd.* (1980), 62 Ohio St.2d 202, 205, 404 N.E.2d
747 ....................................................................................................................................... 27

*Autonation, Inc. v. O'Brien*, 347 F.Supp.2d 1299, 1304 (S.D.Fla.2004) .............................. 15, 17

*Chemclear, Inc. v. Ameriwaste Envtl.Serv., Inc.*, 1992 Ohio App. LEXIS 3747 at *15-*16
(Cuyahoga Cty. July 16, 1992) ....................................................................................... 17, 21

*Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 991 (6th Cir. 2007).................................. 15

*Chubb v. Ohio Bur. of Workers' Comp.* (1998), 81 Ohio St.3d 275, 278, 690 N.E.2d 1267 ....... 26

*Cincinnati Bar Ass'n v. Massengale*, 58 Ohio St.3d 121, 122 (1991)......................................... 15

*Clooney v. Scripps-Howard Broad. Co.*, 35 Ohio App.2d 124, 127-128 (Hamilton Cty.
1973) .................................................................................................................................... 23

*Colucci v. Kar Kare Automotive Group, Inc.*, App. 4 Dist., 918 So.2d 431 (2006).................... 17

*Connin v. Bailey* (1984), 15 Ohio St.3d 34, 35, 472 N.E.2d 328 ................................................ 25

*Convergys Corp. v. Wellman*, 2007 WL 4248202 at *6 (S.D. Ohio November 30, 2007) .......... 15

*Ellis v. Patonai*, 2006 WL 2788562 at p. 13 or *3 (Ohio App. 9 Dist September 29,
2006), 2006-Ohio-5054 ....................................................................................................... 25

*Goldberger v. Bexley Properties*, 5 Ohio St. 3d 82, 84-85 (1983) ............................................. 30

*LCP Holdings Co., v. Taylor*, 158 Ohio App. 3d 546, 556 (Portage Cty. 2004)........................ 24

*Levine v. Beckman*, 48 Ohio App.3d 24, 548 N.E.2d 267, 270 (1988)........................................ 15

*Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997)....................................................................... 13

*Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997) ................................. 13

*MP TotalCare Services, Inc. v. Mattimoe*, 648 F. Supp.2d 956, 962 (N.D. Ohio 2009)............. 14

*Ohio Urology, Inc. v. Poll,* 72 Ohio App.3d 446, 452 (Franklin Cty. 1991)............................... 14

*Professional Investigations & Consulting Agency, Inc. v. Kinglsand*, 69 Ohio app.3d 753
(Franklin Cty. 1990) ........................................................................................................... 24

*R & R Plastics, Inc. v. F.E. Myers Co.*, 92 Ohio App.3d 789, 801-802 (Fulton Cty. 1993) .. 17, 21

*Raimonde v. Van Vlerah*, 42 Ohio St.2d 21 ................................................................... 14

*Sandison v. Michigan High Sch. Athletic Ass'n*, 64 F.3d 1026, 1030 (6th Cir. 1995)................... 13

*Smith dba Investigative Services, v. Demastus*, 1977 Ohio App. LEXIS 8796 (Cuyahoga Cty. Dec. 26, 1985) ................................................................................................. 21

*Smith v. Smith* (1957), 107 Ohio App.3d 440, 443-44, 146 N.E.2d 454 ...................................... 25

*State ex rel. Donovan v. Zajac* (1997), 125 Ohio App.3d 245, 250 ............................................ 25

*State ex rel. Ford v. Cleveland Bd. Of Edn.* (1943), 141 Ohio St. 124, 47 N.E.2d 223 .............. 26

*Walter Management, Inc. v. Stayanchi*, 15 Ohio St.3d 83, 85-86 (1984)...................................... 17

**Statutes**

F.S.A. § 542.335 ................................................................................................. 15, 23

Ohio Revised Code § 1333.67 ..................................................................................... 28

Ohio Revised Code § 1333.61(D)................................................................................. 17, 28

**Other Authorities**

*Federal Practice and Procedure* § 2948 at 129-130 (2d ed.1995)................................................ 13

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| OFFICE DEPOT, INC., | ) | CASE NO:  1:09 CV 2791 |
| | ) | |
| Plaintiff, | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| vs. | ) | |
| | ) | |
| IMPACT OFFICE PRODUCTS, LLC, *et al.* | ) | DEFENDANTS BRIAN KYLE'S AND |
| | ) | PATRICK LAVELLE'S |
| Defendants. | ) | MEMORANDUM IN OPPOSITION TO |
| | ) | PLAINTIFF'S MOTION FOR |
| | ) | INJUNCTIVE RELIEF AND |
| | ) | EXTENSION OF THE TEMPORARY |
| | ) | RESTRAINING ORDER |

## I.      INTRODUCTION

After years of allowing similarly situated employees to leave to compete in the office

supply industry, Office Depot, Inc. suddenly filed this lawsuit against two sales employees to

stop them from pursuing the very job opportunity Office Depot encouraged them to pursue.

Moreover, after letting them compete in the office supply industry for nearly six months, Office

Depot now alleges that Brian Kyle and Patrick Lavelle misappropriated certain customer and

pricing information to unfairly compete against Office Depot.  Office Depot makes these

allegations despite knowing the office supply industry engages in information sharing, Office

Depot itself solicits and uses competitor information obtained from customers, and for many

years has knowingly permitted the unfettered disclosure and use of its own sales and pricing

information by customers and competitors.  As such, this case is not about the alleged theft of

Office Depot's family jewels, but rather is about a bully trying to intimidate two young

professional salesmen from successfully pursing an opportunity to better themselves elsewhere.

Accordingly, as set forth in detail below, Plaintiff's Motion should be denied as it cannot satisfy

its heavy burden under Federal Rule 65 or the Ohio Uniform Trade Secrets Act.[1]

## II.     RELEVANT FACTS

### A.     Kyle and Lavelle's Sales Experience Before Office Depot.

Kyle began his sales career at Pitney Bowes in 1998 as a Service Account Manager.  See

Kyle Dec. at ¶¶ 1-2.[2]  Pitney Bowes is a competitor to Office Depot.  Id. at ¶ 2.  His

responsibilities at Pitney Bowes mirrored those he later assumed at Office Depot – identifying,

marketing, and selling office supplies to Cleveland area clients.  Id at ¶ 3.

While at Pitney Bowes, Kyle was trained on and learned a sales technique called Fact

Finder.  This sales procedure, which involved eliciting from the customer various information,

including information about the decision maker for office supply purchases, the company's

office supply usage, the specialized needs of the customer (including delivery requirements), the

customer's assessment of the current supplier, and pricing, was used to forecast sales and targets.

Id. at ¶ 4.  Kyle utilized this sales procedure during his entire tenure at Pitney Bowes and at his

subsequent jobs.  Kyle even implemented this technique later at Office Depot, where he trained

Office Depot employees on the Fact Finder sales technique.  Id.

Kyle worked for Pitney Bowes approximately three and a half years.  He then joined

Regent Medical, where he sold medical equipment to Cleveland area hospitals for 9 months.  A

short stop at Fifth Third Bank preceded his joining Office Depot in March 2003.  Id. at ¶¶ 6-7.

Lavelle commenced his professional career through a teaching position at Holy Name

High School in June 2003.  Lavelle Dec. at ¶¶ 1-2.  After two years at Holy Name as a teacher,

---

[1]  In its recent Motion for Extension, Plaintiff argues that this Court made specific findings as to the purported merits of Plaintiff's chances for success on the merits. *See* Plaintiff's motion pg. 3 (ECF No. 15).  However, as the Court is aware, the TRO was granted *ex parte* without any argument by Defendants.  As this Memorandum in Opposition demonstrates, the full record shows that the TRO and any alleged extension is unwarranted.

[2]  The declarations of Brian Kyle and Patrick Lavelle are filed contemporaneously herewith.

Lavelle became a sales representative for New York Life, selling its products to both individuals and companies in the Cuyahoga County/Summit County market. Id. at ¶ 3. At New York Life, Lavelle was given extensive sales training and was taught how to identify customers and solicit sales. Id. He learned how to elicit information from the target customer, test needs and demand triggers, gain information about competitor pricing, and how to forecast sales. Id.

Lavelle further developed his sales techniques when he left New York Life and was hired by Guide Book Publishing, where he sold book materials to churches and high schools in Northeast Ohio. Id. at ¶ 4. At Guide Book, Lavelle also obtained additional training on identifying targets and soliciting sales. Id. He would bring all this relevant experience with him to Office Depot.

### B. Kyle's and Lavelle's General Sales Functions at Office Depot and Lack of Any Specialized Training.

#### 1. Brian Kyle:

Kyle joined Office Depot in March of 2003 as an Account Manager. Kyle Dec. at ¶ 8. At his interview, Office Depot told him that it found his prior sales experience and training with Pitney Bowes, particularly in the Cleveland market, to be a significant benefit and encouraged Kyle to use that experience and training to sell office supplies for Office Depot in the Cleveland market. Id. Office Depot was pleased that Kyle could "hit the ground running," and that was the primary reason he was offered a position at Office Depot for the Cleveland market. Id. Office Depot wanted Kyle to rely upon his prior sales experience, contacts, and relationships he established in selling in the Cleveland area to solicit sales on behalf of Office Depot. Id.

During his tenure at Office Depot, Kyle was promoted three times to sales positions with larger geographical territories, culminating with the position of Business Development Manager (BDM)-Major Accounts for Northeast Ohio in late 2006. Id. at ¶ 9-11. Kyle's sales territory as

BDM ran from a western border of Sandusky eastward to the Pennsylvania state line and from a southern border of Richland County northward to Lake Erie.  Id. at ¶ 9 and Ex. 1.  In this position, his primary duty was to solicit sales from businesses that purchased over $150,000.00 in office supplies on an annual basis.  Kyle Dec. at ¶ 11.  From late 2006 until his departure from Office Depot in June 2009, those were the only types of businesses he solicited and contacted to sell Office Depot products.  Id.  Conversely, in his current position at Impact Office Products, Mr. Kyle solicits office supply sales from any sized company, but focuses primarily on selling to small to medium sized businesses (which would not be considered major accounts by Office Depot).  Id.

Regardless of the position or title held, Kyle's responsibility during his tenure at Office Depot was sales.  He was not involved in any strategic planning; he was a prospector.  After he obtained a customer, he turned that account over to Office Depot to be managed by someone else and no longer had any daily contact with the company after it became a customer.  Id. at ¶ ¶ 12 & 22.  The day-to-day contact and liaisoning was done by Office Depot's internal staff, and not by Kyle.  Id. at 22.  It was those other Office Depot employees that would manage the account and provide it with updated pricing, fill new orders, and sell additional items to that customer.  Id.  Unfortunately, several of the customers that he brought to Office Depot were later lost by Office Depot when he turned over the customer to be managed by someone else.  Id.  This resulted in lost income to Kyle because his salary and bonus were premised on sales to the customer from the date a customer was brought to Office Depot until the one year anniversary of the retention of that customer.  Id.

When performing his sales/prospector duties, Kyle used the prior training and sales techniques he learned in his sales jobs with Pitney Bowes and Regent.  Id. at ¶ ¶ 10 & 15.  Given

his prior sales experience, for the first three years of his employment at Office Depot, Kyle was not provided any sales training at all. It was only in the beginning of 2007 when Office Depot had him attend a generic "professional sales seminar" conducted by an outside vendor. Id. at ¶ 14. This training occurred only twice a year and was a one day seminar each time. Id. However, the generic sales techniques presented to him did not cause him to alter the pre-existing Fact Finder sales techniques he acquired through his prior job experiences. Kyle Dec. at ¶ 14.

Specifically, in soliciting sales, Kyle would identify target customers by reviewing various public materials, including Crain's Cleveland Business Book of Lists, the Yellow Pages, and public internet sites. Id. at ¶ 12. Identifying targets was left to him; Office Depot did not provide Kyle any sales leads or list of its target customers. Id.

After Kyle identified a potential customer from public lists and/or other public sources, he would either call or visit the target customer, asking for the name of the employee responsible for the purchase of office supplies. Id. at ¶¶ 12 & 15. If he was able to make contact, he would discuss with that person the company's office supply needs, the criteria used by the company to select and evaluate suppliers, the strengths and weaknesses of the current office product supplier, the process the company uses to procure supplies, any special delivery requirements, and next steps. Id. at ¶ 15. If the target customer was interested in receiving a quote for office supplies, Kyle asked for any reports the target customer had regarding its usage of office supplies (often referred to as "usage reports") and for its current vendor's pricing. Id. Customers readily provided a usage report and competitor pricing. Id. at ¶¶ 16-17 & 19.

### 2. *Patrick Lavelle:*

Lavelle joined Office Depot in April 2006 as a Business Development Manager. Lavelle Dec. at ¶5. When interviewing for the position, Office Depot told him that it found his prior

sales experience and contacts in the Northeast Ohio market valuable and believed that this experience and the contacts would permit him to be successful in the sale of office supplies. Id.

In February 2009, Lavelle's job title was changed to Territory Development Manager and his assigned sales territory was expanded to include a western boundary of Millersburg, Ohio eastward to the Pennsylvania state line and a northern boundary of Cuyahoga Falls and Akron extending southward to Cambridge Ohio.  Lavelle Dec. ¶ 6 and Ex. 1.  Lavelle's target customers were businesses spending less than $125,000 annually on office supplies.  Id. at ¶ 6.

In both of his positions as Business Development Manager and Territory Development Manager, Lavelle's primary job function was to sell.  Id. at ¶ 7.  To do so, he identified target customers by reviewing various public materials, including Crain's Cleveland Business Book of Lists, the Yellow Pages, and public internet web sites.  Id.  When soliciting sales, Lavelle used the sales techniques he learned at New York Life and Guide Book Publishing, which encompassed identifying a potential customer from public lists and then approaching that target customer about its needs.  Id. at ¶ 10.  Lavelle essentially cold-called potential customers – Office Depot did not provide Lavelle with any leads – and discuss their office supply needs and next steps.  Id. at ¶ 7.  Like Kyle, if the target customer was interested in receiving a quote for office supplies, Lavelle asked for its usage report and current supplier's pricing.  This sales technique was not changed or modified as a result of any of the limited training (four separate days of generic sales techniques taught by an outside vendor) Lavelle received while at Office Depot.  Id. ¶ 9.

**C.**     <u>**Office Depot's Lack of Safeguarding Measures & Ever-Changing Pricing.**</u>

Office Depot took minimal measures to protect its information.  Company wide computer access to databases was only minimally restricted (i.e., enter your password and you obtained unfettered access to the network).  Kyle Dec. at ¶ 23; Lavelle Dec. at ¶ 18.  Neither Kyle nor

Lavelle (nor anyone else as far as they knew) had to obtain any heightened permission from any supervisors to access customer or pricing information.[3]  Id.

Furthermore, none of the Office Depot documents that Kyle and Lavelle were exposed to and used in their day-to-day dealings were designated with any "confidentiality" markings.  Kyle Dec. ¶ 24; Lavelle Dec. ¶ 19.  Similarly, none of the Office Depot customers were ever asked to sign any confidentiality agreements or otherwise commit to keeping any of Office Depot's pricing, marketing, quotations, or usage reports confidential.  Id.  On the contrary, Office Depot permitted unfettered access to the information it now contends is secret.  By way of example, Office Depot knew that its customers were sharing their Office Depot usage reports and pricing with Office Depot's competitors, yet did nothing about it.  Kyle Dec. at ¶ 25; Lavelle Dec. at ¶ 20.  Office Depot also knew that customers periodically shared their password to Office Depot's website with competitor sales agents to enable the sales agent to access the website and learn the customer's usage and pricing (to enable the competitor to prepare a rival quote).  Id. Despite this knowledge, Office Depot did nothing to stop the sharing and disclosure of its allegedly confidential pricing, costs, and usage information with such competitors.  Id.  Instead of restricting access and limiting dissemination, it exposed even more of the information it now suddenly contends is secret – it shared with its customers the actual costs Office Depot was charged by its own suppliers so that Office Depot's customers could determine what Office Depot's mark-ups and margins were on the products it was selling.  Id.  This was also done without requiring the customer to sign any confidentiality agreement.

The lack of any stringent safeguarding measures is predicated upon the fact that Office Depot's pricing and costs changed regularly.  Every month, Office Depot issued cost remediation

---

[3]  Neither Lavelle nor Kyle was exposed to any strategic, financial, or marketing initiatives/plans.  Kyle Dec. ¶ 23; Lavelle Dec. ¶ 18.

reports that adjusted the prices and mark-ups of its office supply products.  Kyle Dec. ¶ 26;

Lavelle Dec. ¶ 21.  These adjustments were the result of changes in the prices charged to Office

Depot by its vendors it was purchasing its products from.  Thus, sales representatives were given

monthly price adjustment reports, which resulted in constantly changing quotations for similar

products.  For example, Company A would receive a price for a stapler in June which was

different than the price quoted to Company B a couple of months earlier for the same stapler.

This meant that an Office Depot product's profit margins also changed on a monthly basis.  Kyle

Dec. ¶ 26; Lavelle Dec. 21.  Further, on a bi-annual basis, all pricing was assessed company wide

and often changed.  Kyle Dec. at ¶ 28; Lavelle Dec. at ¶ 23.  At such times, catalogs were also

sent to customers with the updated pricing and product changes.  Id.  None of the cost

remediation reports or catalogs were marked "confidential."  Kyle Dec. at ¶ 27; Lavelle Dec. at ¶

22.

     **D.**     **Industry Practices -- The Public Availability of Pricing and Customer Information and the Portability of Employees.**

          **1.**     *Information Sharing in the Industry – there are no Secrets.*

It is an industry wide practice for customers in the office supply industry to readily share

and disclose pricing information in order to obtain the best possible price.  Kyle Dec. at ¶¶ 16-

19; Lavelle Dec. at ¶¶ 11-14.  In fact, while at Office Depot, both Kyle and Lavelle received

numerous usage reports and other information from competitors along with competitor price

sheets and invoices.  *See* paragraphs 19 and 14 of Kyle and Lavelle Declarations, respectively,

for sampling of competitor usage reports and price lists received by them from target customers.

Customers readily disclosed and provided such information to get a better price on virtually

identical office supplies such as copy paper and pens.  To this extent, Office Depot actively

encouraged its employees to solicit competitor usage reports and pricing when targeting and

selling potential customers.  Kyle Dec. at ¶ 17; Lavelle Dec. at ¶ 12.  Office Depot would then use those usage reports and price lists to generate rival quotes for the target customer.  Id.  In doing so, Office Depot necessarily recognized the public nature of pricing and customer information – the information was not secret or otherwise restricted from further use or dissemination.

Office Depot also recognized that customer lists and target lists were not secret or confidential.  Indeed, Office Depot encouraged the use of competitor customer lists.  By way of example, when former Office Max employee Mark Mottola joined Office Depot in the fall of 2006, he brought with him an Office Max customer list, which Office Depot circulated to its Northeast Ohio sales reps to use in targeting Office Max's business.  Kyle Dec. ¶ 18; Lavelle Dec. ¶ 13.  Office Depot never discouraged the use or gathering of such information, but instead encouraged it, recognizing that the information (i.e. customer identities and customer information) contained in such lists was not confidential.  Id.

### 2. *Office Depot allowed Similarly Situated former Employees to compete.*

During Kyle's and Lavelle's employment at Office Depot, several former sales employees left to go work for independent office supply or support companies.  Kyle Dec. ¶ 29; Lavelle Dec. ¶ 24.  There are at a minimum four such former employees (Courtney Barrow, Mark Mottola, Amy Sheerer, and Scott McKenna).  Id.  Those employees had signed employment agreements that contained competition and solicitation restrictions similar to those Office Depot is now seeking to enforce against Kyle and Lavelle.  Id.  Yet, despite knowing that those employees immediately began competing in the office supply sales business, Office Depot has not sued nor taken any action against those employees.  Id.  Office Depot let those individuals go and immediately compete in the office supply industry.

**E.    Kyle and Lavelle's Encouraged Departure to Work for an Independent Office Supply Company.**

In February 2009, Office Depot dramatically changed its compensation and benefits program.  That change negatively impacted both Kyle and Lavelle.  Kyle Dec. at ¶ 31; Lavelle Dec. at ¶ 26.  It impacted their base compensation, their potential bonus, and benefits.  Id.  In essence, Office Depot was telling both of them to do much more for much less pay.  Id.

Kyle approached his direct supervisor Jeff Gagliardo about these issues and Lavelle did the same with his supervisor, Dave Fischer.  Kyle Dec. at ¶ 33; Lavelle Dec. at ¶ 26.  Gagliardo told Kyle to "take it or leave it" as there were plenty of other people that needed jobs and would take less pay.  Fisher suggested to Lavelle and Kyle that if they wanted to continue to make the same kind of money in the office supply industry as they had in 2008 with Office Depot, they needed to leave and immediately go work for an independent office supply company.  Kyle Dec. at ¶¶ 32-33; Lavelle Dec. at ¶ 26.

Being confronted with increased responsibilities, reduced pay, and less than sympathetic support from Gagliardo, Kyle and Lavelle began to weigh their options (and heed the advice of Fisher to seek employment at independent office supply companies).  Id.  Both directly asked Fischer about whether taking his advice and working for an "independent" would cause any concerns over the non-compete and non-solicitation provisions in their Employment Agreements.  Kyle Dec. at ¶¶ 32 & 34; Lavelle Dec. at ¶¶ 27 & 29.  Each time, Fischer told them it would not cause any issues because, among other things, Office Depot did not consider such independents to be a competitor.  Id.  Indicative of this was that several former sales employees that left Office Depot (before Kyle and Lavelle) to go work for such independent office supply companies were not sued by Office Depot, despite those employees having employment agreements identical to those at issue in this case and commencing competition in the office

supply industry immediately upon their departure from Office Depot.  Kyle Dec. at ¶¶ 29-30; Lavelle Dec. at ¶¶ 24-25.

In reliance upon these comments and actions, Kyle and Lavelle interviewed with Impact Office Products and received offers to work for Impact.  Kyle Dec. at ¶ 34; Lavelle Dec. at ¶ 29. On or about June 2, 2009, Kyle provided notice of his resignation.  Kyle Dec. at 35.  At that time, he began to wind down his responsibilities and transfer tasks to members of his team.  Id. at ¶ 38.  He also emailed a document titled "Cleveland Target List" to his personal email address. The document Kyle emailed to himself was a list of target customers.  Id.  He created that list in 2005 based upon information from the Crain's Cleveland Book of Lists and other public sources, and included information he learned from conversations with those targets.  He updated the list annually with the status of his efforts or activity with the target.  The last time he updated the document prior to his departure was in the summer of 2007.  Id.

Kyle left Office Depot on June 5, 2009.  Office Depot never conducted a formal exit interview with him; it only asked him to return his cell phone, American Express card, and lap top computer.  Id. at ¶¶ 37 & 39.  Prior to his departure, Kyle did not tell any current or target customer of Office Depot that he was leaving to join Impact.  Id. at ¶ 39.

Shortly after Kyle left, Lavelle handed in his resignation notice.  Lavelle Dec. at ¶ 30.  At his exit meeting on June 15, 2009, Fisher asked Lavelle for his cell phone, lap top computer, American Express card, and RSA token, and nothing else.  Id. at¶ 31.  Like Kyle, Lavelle did not tell any current or target customer of Office Depot that he was leaving to join Impact.  Id. at ¶ 32.

**F.**     **Lapse of Time and Reliance upon Office Depot's Prior Actions.**

When Lavelle and Kyle joined Impact, they felt they could do so without restriction for several reasons.  First, in performing their jobs, they would be relying upon their general and prior sales skills.  Kyle Dec. at ¶¶ 40 & 43; Lavelle Dec. at ¶ 33 & 37.  Second, nothing they

used in office supply sales is deemed confidential.  On the contrary, customers readily shared competitor information (including pricing), Office Depot itself used (and encouraged the use of) competitor information, and Office Depot's own pricing is readily shared in the industry.  Kyle Dec. at ¶¶ 16-18, 20, 40 & 43; Lavelle Dec. at ¶¶ 12, 15, 34 & 37.  For example, when Lavelle solicited a company called Valmark on behalf of Impact, it provided him with a copy of its Office Depot usage report and Office Depot's pricing so that Impact could use that information to prepare a rival quote.  Lavelle Dec. at ¶ 34 and Ex. 3.

Third, Kyle and Lavelle were selling to a broader range of customers on behalf of an entirely different company – an independent office supply company.  Kyle Dec. at ¶ 43; Lavelle Dec. at ¶ 37.  Fourth, Office Depot had not enforced its non-competition and non-solicitation agreements against at least four other employees who went to work for independent office supply or support companies, and Office Depot (through Dave Fisher) recommended that they join an independent office supply company, which Office Depot did not consider to be a competitor.  Id.

In reliance upon those factors, Kyle and Lavelle accepted positions at Impact and began investing in their jobs with that company, including Kyle spending money to convert a room into a home office and both purchasing computers and other supplies for their jobs.  Kyle Dec. at ¶ 44.  Thus, Kyle and Lavelle were thoroughly surprised when Office Depot sued them about 6 months after they left Office Depot.  This is particularly so because, when selling for Impact, both engage in the same sales activity they have engaged in throughout their professional careers, using and relying upon information that is publicly available and shared in the industry.  Kyle Dec. at ¶¶ 43 & 45; Lavelle Dec. at ¶¶ 37 & 39.  And, to the extent Kyle and Lavelle relied upon pricing information from their tenure at Office Depot (which ended in June 2009), that

information would be outdated and stale because Office Depot's pricing and profit margins are updated every month via the cost remediation reports. Kyle Dec. at ¶ 26; Lavelle Dec. at ¶ 21.

### III. LAW AND ARGUMENT

#### A. Standard for Issuance of a Preliminary Injunction.

This court should deny Plaintiff's motion for temporary restraining order and preliminary injunction. A preliminary injunction is an extraordinary remedy and should only be granted when the relief sought is necessary to protect a clear right from immediate and irreparable harm and when no other adequate legal remedy exists. *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948 at 129-130 (2d ed.1995)). When considering a motion for a preliminary injunction, the court should consider four factors:

1. whether the movant has a strong likelihood of success on the merits;

2. whether the movant would suffer irreparable injury without the injunction;

3. whether issuance of the injunction would cause substantial harm to others; and

4. whether the public interest would be served by issuance of the injunction.

*Sandison v. Michigan High Sch. Athletic Ass'n*, 64 F.3d 1026, 1030 (6th Cir. 1995). Further, each element must be established by clear and convincing evidence. *Mazurek,* 520 U.S. at 972. If a plaintiff fails to establish a substantial likelihood of success on the merits, it is unnecessary to address the remaining three factors. *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997) (explaining that where the court concludes that there is no substantial likelihood of success on the merits, it need not address the other three factors). Office Depot has failed to meet its heavy burden of proof on any of these elements relating to any of its purported claims.

**B.**   **Office Depot Cannot Establish It Has a Strong Likelihood of Prevailing on the Merits.**

Office Depot has used two claims to premise its claim for injunctive relief against Kyle and Lavelle:  breach of contract and trade secret misappropriation.[4]   Each of those claims are fatally flawed.

### 1.    The Breach of Contract Claim

For the purposes of obtaining injunctive relief for breach of restrictive covenants in a contract, a party must show, among other things, that the covenants are enforceable.  *MP TotalCare Services, Inc. v. Mattimoe*, 648 F. Supp.2d 956, 962 (N.D. Ohio 2009).  Office Depot's claim fails in that it cannot establish its restrictive covenants are enforceable.  Indeed, the non-competition and non-solicitation provisions of the Employment Agreements are unenforceable under both Ohio and Florida law, because they:  1) do not protect a legitimate business interest of Office Depot; 2) are unreasonable in scope; and 3) enforcement of such provisions is barred by laches, waiver, and Office Depot's inequitable conduct.

**a)**    **Standard under Ohio Law for Enforcement of Non-Competition and Non-Solicitation Provisions**

The non-competition and non-solicitation provisions in the employee contracts constitute restrictive covenants.  Ohio "does not favor restrictive covenants."  *Ohio Urology, Inc. v. Poll,* 72 Ohio App.3d 446, 452 (Franklin Cty. 1991).  Under Ohio law, a restrictive covenant is only valid when it: (1) is no greater than required for the protection of the employer's legitimate business interest; (2) imposes no undue hardship on the employee; and (3) is not injurious to the public.  *Raimonde v. Van Vlerah*, 42 Ohio St.2d 21, paragraph two of syllabus (1975).  "The party seeking to enforce the covenant 'is required to adduce clear and convincing evidence as to

---

[4] Although Office Depot has only moved this court for injunctive relief against Kyle and Lavelle based on two of its five claims asserted against them, any request for injunctive relief based upon the remaining claims, unjust enrichment, breach of duty of loyalty, and tortious interference with business relationships, would also fail, as it would not be able to prove a substantial likelihood of success on the merits of any of those claims.

each of these factors' in order to prove that the covenant is reasonable." *Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 991 (6th Cir. 2007) (citing *Levine v. Beckman*, 48 Ohio App.3d 24, 548 N.E.2d 267, 270 (1988)). Clear and convincing evidence is more than a mere preponderance of the evidence; it must create in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. *Cincinnati Bar Ass'n v. Massengale*, 58 Ohio St.3d 121, 122 (1991); *Convergys Corp. v. Wellman*, 2007 WL 4248202 at *6 (S.D. Ohio November 30, 2007).

A court should additionally take the following considerations into account when assessing the reasonableness of a covenant under Ohio Law:

> whether the covenant imposes temporal and spatial limitations, whether the employee had contact with customers, whether the employee possess confidential information or trade secrets, whether the covenant bars only unfair competitions, whether the covenant stifles the employee's inherent skill and experience, whether the benefit to the employer is disproportionate to the employee's detriment, whether the covenant destroys the employee's sole means of support, whether the employee's talent was developed during the employment, and whether the forbidden employment is merely incidental to the main employment.

*Chicago Title* at 991-992. On balance, as explained below, these considerations under Ohio law favor Defendants.

> **b)** **Standard Under Florida Law for Enforcement of Non-Competition and Non-Solicitation Provisions**

Similarly, under Florida law, restrictive covenants are valid if the employer can prove: 1) the existence of one or more legitimate business interests justifying the restrictive covenant, and 2) that the specified restraint is reasonably necessary to protect the established interests of the employer. *Autonation, Inc. v. O'Brien*, 347 F.Supp.2d 1299, 1304 (S.D.Fla.2004); See also F.S.A. § 542.335. A "legitimate business interest" is statutorily defined as including: 1) trade secrets, 2) valuable confidential business or professional information that otherwise does not qualify as trade secrets, 3) **substantial** relationships with specific prospective or existing

customers, patients, or clients, 4) customer, patient, or client goodwill associated with various considerations, and 5) ***extraordinary*** or ***specialized*** training.  Florida law specifically states that, "[a]ny restrictive covenant not supported by a legitimate business interest is unlawful and is void and unenforceable."  F.S.A. § 542.335 (emphasis added).  Office Depot cannot meet its heavy burden of proof on any of the elements for a valid restrictive covenant.

>    c)    **Office Depot Has No Legitimate Interest to Protect Through Enforcement of the Restrictive Covenants.**

Office Depot has no legitimate interest to protect through enforcement of the non-competition and non-solicitation provisions.  Office Depot makes several blanket assertions throughout its Motion regarding its purported legitimate business interests that are at risk without injunctive relief, including that Defendants Kyle and Lavelle

> were provided with and had general access to confidential, proprietary information and trade secrets developed and used by Office Depot including financial information, sales information, pricing models, the identity and lists of actual and potential clients, marketing information, and other information regarding Office Depot's methods, processes, services, clients, operations and business, and regarding the services required and/or preferred by Office Depot's clients.

Plaintiff's Motion at p. 3.

Specifically, Office Depot has alleged that Kyle copied, downloaded and emailed to Lavelle confidential documents which contained a variety of confidential customer information, including but not limited to, documents containing cost and pricing information, customer lists and target lists.  Plaintiff's Motion at pp. 7-8.  The business interests that Office Depot claims are at risk without enforcement of the restrictive covenants are its profit margins that Defendants Kyle and Lavelle have allegedly shared with customers and the information obtained by accessing the confidential password secured Office Depot website without consent.  Plaintiff's Motion at pp. 7-8.  Such information, however, is neither "confidential" nor a "trade secret" as

such costing and pricing information and customer identification was not held in such manner by

Office Depot, and is readily available directly from the customer or other public avenues.

**(1)      Standard for Trade Secret and Confidential
Information.**

A "trade secret" is information that satisfies both of the following: (i) it derives

independent economic value from not being generally known to (and not being readily

ascertainable by proper means by) other persons who can obtain economic value from its

disclosure or use; and (ii) this is the subject of efforts that are reasonable under circumstances to

maintain its secrecy. Ohio Revised Code § 1333.61(D).  There is no presumption that any

particular information is a trade secret.  *Walter Management, Inc. v. Stayanchi*, 15 Ohio St.3d 83,

85-86 (1984).  Moreover, information which is readily obtainable in trade publications or

generally known in the industry does not constitute a trade secret.  *R & R Plastics, Inc. v. F.E.*

*Myers Co.*, 92 Ohio App.3d 789, 801-802 (Fulton Cty. 1993).  *Chemclear, Inc. v. Ameriwaste*

*Envtl.Serv., Inc.*, 1992 Ohio App. LEXIS 3747 at *15-*16 (Cuyahoga Cty. July 16, 1992)

(information regarding plaintiff's customers' buying habits and requirements was not entitled to

trade secret status as such information was obtainable through independent research, public

information, and the customers themselves who readily disclose prices they were paying to

vendors in order to obtain competitive bids).[5]

Information that is protectable by means of a non-competition agreement also includes

that which is unique in the industry and confidential.  *Colucci v. Kar Kare Automotive Group,*

*Inc.*, App. 4 Dist., 918 So.2d 431 (2006).  Information that is commonly known in the industry

and not unique to the allegedly injured party is not confidential and not entitled to protection.

*Autonation, Inc. v. O'brien*, S.D.Fla. 2004, 347 F.Supp.2d 1299.  The information Office Depot

---

[5]   Unreported cases are attached in alphabetical order as Exhibit 1.

is claiming as its legitimate business interest is neither protectable as trade secret nor as confidential information.

### (2)    Office Depot's Well Known and Outdated "Trade Secrets."

Office Depot contend enforcement of its non-compete agreement is justified to protect its purported trade secrets (*i.e.*, pricing and customer information).  The information which Office Depot claims should protected as trade secrets, however, was never reasonably protected as such by Office Depot and was readily known in the industry.  Further, to the extent any of the information ever did constitute a trade secret, that information is now stale and irrelevant.  There is no economic value tied to the information that Kyle and Lavelle allegedly possess.  Accordingly, Office Depot has no legitimate protectable business interest in the information it alleges constitute "trade secrets."

First, any information obtained by Kyle and Lavelle was readily ascertainable by others.  Customers, such as those in the customer lists Office Depot alleges Kyle purloined, are generally identified in the office supply industry through public materials.  Lavelle Dec. at ¶¶ 7-8, Kyle Dec. at ¶¶ 12-13.  Any information such as the customer's usage, pricing, forecast and even the person responsible for the business' office supply purchases are readily shared by customers in the office supply industry.  Kyle Dec. at ¶¶ 16-17; Lavelle Dec. at ¶¶ 11-12.  Any further information such as profit margins may be independently ascertained from information readily shared by customers in the industry.  Indeed, Office Depot shared with certain customers the actual costs it was charged by the vendors from whom it purchased the products its sold to its customers, enabling the customer to determine what Office Depot's mark-ups and margins were on the products it was selling.  Kyle Dec. at ¶ 20.

Second, Office Depot did not make reasonable efforts to keep the information secret. Access to company information was only minimally restricted, and once logged into the Office Depot server, a user could access any information on the computer.  Kyle Dec. at ¶ 23; Lavelle Dec. at ¶ 18.  No documents or files were ever marked as confidential. Kyle Dec. at ¶ 24; Lavelle Dec. at ¶ 19.  No customer was ever asked to sign confidentiality agreements or commit to keeping Office Depot's pricing, marketing, or usage reports confidential.  Id.  Customers were given readily-available passwords to Office Depot's website where they could easily access their individual information regarding usage and pricing and print off any number of copies of that information.  Kyle Dec. at ¶ 25; Lavelle Dec. at ¶ 20.  Customers regularly did this – even sharing their password with competitor sales agents to enable them to access the website to determine pricing and usage – so as to provide such purportedly confidential, trade secret information to competitors to obtain rival bids.  Id.  Office Depot knew that its customers such as Goodyear, Sterling Jewelers, and Aleris International were sharing Office Depot usage reports and pricing with competitors, yet did nothing to stop such sharing of pricing, costs, and usage. Id.  Office Depot has simply failed to take reasonable steps to maintain any type of trade secret status regarding this information.  As such, there is no independent economic value to that information because it is commonly known (and readily discoverable) within the office supply industry.

Finally, to the extent that any information obtained by Defendants would have been subject to trade secret protection, that information is now stale.  Office Depot regularly changes its pricing. Kyle Dec. at ¶¶ 26-27; Lavelle Dec. at ¶¶ 21 & 22.  Specifically, cost and pricing information is changed monthly pursuant to cost remediation reports, which were never marked as confidential.  Id.  Thus, profits margins also changed on a monthly basis.  Id.  Further, all

pricing is assessed and often changed on a bi-annual basis, and those changes are reflected in catalogs sent to customers, which also were never marked as confidential.  Kyle Dec. at ¶ 28; Lavelle Dec. at ¶ 23.  Accordingly, any information that Kyle and Lavelle may have possessed or obtained upon their departure from Office Depot regarding pricing and costs is no longer relevant.  There is no economic value to stale, old information and, accordingly, that information no longer constitutes trade secrets.

**(3)     The Same Purported Confidential Information is not a Legitimate Business Interest**

Any information that Defendants Kyle and Lavelle obtained during their respective employments with Office Depot is not confidential information.  Customers are generally identified in the office supply industry through public materials.  Lavelle Dec. at ¶ 10; Kyle Dec. at ¶ 15.  Any information such as the customer's usage, pricing, forecast and even the person responsible for the business' office supply purchases are readily shared directly by customers themselves.  Kyle Dec. ¶¶ 16-18; Lavelle Dec. at ¶¶ 10-13.  Thus, any further information such as profit margins may be independently ascertained from information readily shared by customers in the industry.

Besides customer information, Office Depot asserts that Defendants Kyle and Lavelle possess confidential information regarding methods and processes employed by Office Depot.  Plaintiff's Motion at p. 3.  However, Office Depot's does nothing further to explain such specialized methods and processes.  It fails to do so because it cannot; such methods and process for talking to a customer to determine their office supply needs and ordering such supplies amounts to nothing more than standard industry practice.  Defendants used the same techniques and methods to obtain and service their customers for Office Depot as they did for previous employers.  Kyle Dec. at ¶ 15; Lavelle Dec. at ¶ 10.

{C0047414.2 }

Information that is common and known in an industry cannot be afforded protection by a restrictive covenant. *R & R Plastics, Inc. v. F.E. Myers Co.*, 92 Ohio App.3d 789, 801-802 (Fulton Cty. 1993). *Chemclear, Inc. v. Ameriwaste Envtl.Serv., Inc.*, 1992 Ohio App. LEXIS 3747 at *15-*16 (Cuyahoga Cty. July 16, 1992). Therefore, Office Depot cannot show by clear and convincing evidence that it has a legitimate business interest in any of its allegedly trade secret or confidential customer information or its methods and processes.

### (4)    Kyle and Lavelle Did Not Receive Specialized or Extraordinary Training.

Defendants Kyle and Lavelle joined Office Depot with extensive training in sales. Office Depot cannot restrain former employees from using their general skills, job-related memory, and pre-existing knowledge. *Smith dba Investigative Services, v. Demastus*, 1977 Ohio App. LEXIS 8796 (Cuyahoga Cty. Dec. 26, 1985).

Kyle joined Office Depot with knowledge and expertise gained from former employment with Pitney Bowes, a direct competitor of Office Depot. Kyle Dec. at ¶¶ 2-7. At Pitney Bowes, Kyle was a Service Account Manager with responsibilities that included selling to customers in the Cleveland area, forecasting and targeting sales, and marketing to customers in his territory. Id. at ¶¶ 3-4. During his three and a half year tenure, Kyle gained valuable expertise that he brought with him to Office Depot. That expertise included a sales technique that involved eliciting information from a customer, such as information about the decision maker for office supply purchases, the company's office supply usage, the specialized needs of the customer, the customer's assessment of the current supplier, and pricing to forecast sales and target. Id. at ¶ 4. In fact, it was that very training that Office Depot valued so he could "hit the ground running" and immediately start making sales. Kyle Dec. at ¶ 8.

Similarly, Lavelle brought extensive sales experience in the Ohio Northeast with him to Office Depot.  Lavelle Dec. at ¶¶ 3-4.  Lavelle formerly was employed by New York Life where he received extensive sales training and was taught how to identify customers and elicit information such as competitor pricing and other information necessary for sales forecasts.  Id. at ¶ 3.  Such sales skills were further honed during his employment with Guide Book Publishing.  Lavelle Dec. at ¶ 4.  Again, as with Kyle, Office Depot valued Lavelle's prior experience and contacts.  Id. at ¶ 5.

Any "training" provided to Defendants Kyle and Lavelle hardly rises to the level of extraordinary training that would qualify as a protectable business interest.  In fact, Kyle received no advanced sales training in his first three years at Office Depot, and simply relied on his training skills acquired prior to his employment with Office Depot.  Kyle Dec. ¶14.  Kyle later did attend four sales seminars, but they provided no more training that what Kyle already possessed.  Id.  Similarly, Lavelle received the same limited and inconsequential training from Office Depot.  Lavelle Dec. ¶9.  In sum, Office Depot did very little to train its employees and, accordingly, cannot enforce a restrictive covenant to protect what little training it did provide.

### d)      The Scope of the Restrictive Covenants is Overly Broad.

Even if Office Depot were to have a legitimate business interest to protect, the geographic and employment scopes of the covenants are unreasonable.  The provision seeks to prevent Defendants from working for a competitive business in any capacity on a global scale.  The provision states that Defendants cannot "own any interest in, manage, control, or participate in, work for, consult with or render services for office products superstores or contract/commercial stationers within any geographical area in which the Company or its subsidiaries engage or plan to engage in such business."  Thus, Defendants would be prevented from assuming any other type of role for a competitor of Office Depot, whether as a store

manager, checkout attendant, or janitor, none of which would require them to apply any specialized sales knowledge or skills whatsoever.  As such, Office Depot's non-compete provision is enforceable for the reason that it has no correlation to the capacity in which Defendants worked while at Office Depot.  *Professional Investigations*, 69 Ohio App.3d at 759.; *Cintas*, 2004 WL 2032124 at *15-16 (covenant unduly harsh as it would prevent ex-employee from working for any division in any capacity for competitor); *Clooney v. Scripps-Howard Broad. Co.*, 35 Ohio App.2d 124, 127-128 (Hamilton Cty. 1973) (holding covenant should be narrowly tailored to the "special, unique, unusual and extraordinary" abilities of employee).

Further, the non-solicitation provision is overly broad in that it attempts to restrict Defendants Kyle and Lavelle from doing business with ***any*** customer, supplier, licensee, franchisee or other business relation of the Company or any subsidiary.  Thus, Defendants would be prevented from working with any customer that did business with Office Depot, regardless of whether Defendants personally dealt with the customer, had information regarding the customer, or were even aware that the customer was, in fact, a customer of Office Depot.  This restriction is not an attempt at restricting solicitation of customers with whom Kyle and Lavelle had relationships, let alone ***substantial*** relationships, as required under Florida law (which Defendants Employment Agreements state controls the interpretation of each agreement).  See F.S.A. § 542.335.  Thus, this restriction is unreasonable and excessive for any legitimate business interest Office Depot might have in restraining solicitation.  It is simply an attempt to stifle fair competition among office supply sales representatives by restricting solicitation of any customer, regardless of Defendants' knowledge about or relationship with that customer.

### e)     Reformation of the Defective Restrictive Covenants Is Not Mandatory

Office Depot has argued, at least with respect to the geographical scope, that this court should now stand in Office Depot's shoes and attempt to re-write the non-compete provision so as to somehow cure it and make it "reasonable."  Plaintiff's Motion at p. 11 (requesting the court to only enforce the covenant within the territories they were assigned).  Office Depot is wrong.  Ohio does not require a court to cure defective restrictive covenants.  Rather, any permissive language from the *Raimonde* decision that implies a court has the power to reform a non-compete only means that such power is totally discretionary with the court.

For example, in *Professional Investigations & Consulting Agency, Inc. v. Kinglsand*, 69 Ohio app.3d 753 (Franklin Cty. 1990), the employer argued that the *Raimonde* language mandated that the court re-draft the defective and overly broad non-compete at issue.  The court disagreed:

> The non-compete clause drafted by [the employer] contains no easily modifiable temporal or geographic restriction.  To bring [the employer's] clause into compliance with the rule of reasonableness, the trial court could not easily modify existing provisions but might be required to rewrite the entire covenant.  The use of permissive language in the Raimonde decision implies that the modification is with the discretion of the trial court.  We have found no case which states that a trial court must totally rewrite a provision in order to carry out its discretionary powers.  The trial court did not abuse its discretion in declining to modify the restrictions even if the non-competition clause [was] enforceable.

Id. at 760-761.  See also *LCP Holdings Co., v. Taylor*, 158 Ohio App. 3d 546, 556 (Portage Cty. 2004) (holding that trial court did not abuse its discretion by declining to modify the restrictive covenant as any modification would entail substantial changes to the agreement).

Here, the wide sweeping restrictive covenant not to compete would require substantial modification by this Court.  This court would first have to decide what specific geographic limitation is appropriate given that both Defendants worked in substantially large areas.  To

restrict Defendants from working in the large geographic areas would essentially require them to move their homes and work outside of a geographical area they worked in for many years prior to Office Depot and, in Kyle's case, for also a competitor of Office Depot.  As both Defendants already had substantial experience working sales in the Northeast Ohio region, it would be difficult to ascertain what legitimate business interest would be protected by enforcing any given geographic restriction, as both Defendants came to Office Depot with experience and customer contacts in this region.

> **f)** **Office Depot's Breach of Contract Claim is Barred by Laches.**

The restrictive covenants are further unenforceable because enforcement of them is barred by laches.  "Laches is an omission to assert a right for an unreasonable and unexplained length of time, under circumstances prejudicial to the adverse party.  It signifies delay independent of limitations in statutes.  It is lodged principally in equity jurisprudence." *Connin v. Bailey* (1984), 15 Ohio St.3d 34, 35, 472 N.E.2d 328, quoting *Smith v. Smith* (1957), 107 Ohio App.3d 440, 443-44, 146 N.E.2d 454.  Prejudice can be shown by either (1) a loss of evidence helpful to the defendant's case; or (2) a change in the defendant's position that would not have occurred if the plaintiff did not delay in asserting his or her rights.  *State ex rel. Donovan v. Zajac* (1997), 125 Ohio App.3d 245, 250.  Prejudice may involve a good faith change of position in reliance upon a complainant's inaction, the acquisition of rights by innocent third parties, or the expenditure of money or incurring of obligations upon belief of possession of a clear or unencumbered right.  *Ellis v. Patonai*, 2006 WL 2788562 at p. 13 or *3 (Ohio App. 9 Dist September 29, 2006), 2006-Ohio-5054.

Office Depot's claim is barred by laches because enforcement of them now would be materially prejudicial to Defendants due to the Defendants' change in position, the acquisition of rights of third parties such as customers, and the expenditure of money and incurring of

obligations by Defendants.  Both Defendants Kyle and Lavelle, upon belief that Office Depot

would not seek to enforce the covenants due to its:  (a) omission to enforce the covenants upon

their departure; (b) its past practice of not enforcing the agreements against former employees

that left to work for independent office supply like companies (like Kyle and Lavelle did); (c) the

encouragement of Office Depot management that they pursue opportunities at independent office

supply companies; and (d) the additional representations from Office Depot management that the

restrictive covenants were deemed inapplicable to employment at independent office supply

companies, which Office Depot did not consider to be competitors, whereupon Kyle and Lavelle

spent significant money in establishing home offices and working earnestly to establish

themselves as representatives of Impact. Kyle Dec. at ¶ 43; Lavelle Dec. at ¶ 37.  It was not until

five months after their departures from Office Depot (almost the entire time period of the

restrictive covenants), that either Defendant received a letter from Office Depot expressing its

concern with the new employment.  Kyle Dec. at ¶ 45; Lavelle Dec. at ¶ 39.  Office Depot

unreasonably delayed in asserting its contract rights, and enforcement of them now would

materially prejudice the Defendants and the innocent third party customers they secured for

Impact Office Products.

**g)      Office Depot's breach of contract is barred by waiver.**

Office Depot cannot establish it will succeed on the merits of its breach of contract claim

because it is further barred by waiver.  Waiver is a voluntary relinquishment of a known right

that applies generally to all personal rights and privileges.  *Chubb v. Ohio Bur. of Workers'*

*Comp.* (1998), 81 Ohio St.3d 275, 278, 690 N.E.2d 1267.  A person can voluntarily relinquish a

known right by words or by conduct.  *State ex rel. Ford v. Cleveland Bd. Of Edn.* (1943), 141

Ohio St. 124, 47 N.E.2d 223.  The person that owes the duty to perform may assert the defense

of waiver if he has changed his position as a result of another party's voluntary relinquishment of

a known right.  *Andrews v. Teachers Retirement Sys. Bd.* (1980), 62 Ohio St.2d 202, 205, 404 N.E.2d 747.

Office Depot waived its right to bring an action to enforce the restrictive covenants through both its words and actions.  During Kyle and Lavelle's employments with Office Depot, there were numerous instances of former sales employees leaving Office Depot to join competitors.  Kyle Dec. at ¶¶ 29-30; Lavelle Dec. at ¶¶ 24-25.  Those employees had signed employment agreements that contained competition and solicitation restrictions similar to those at issue in the present action.  Kyle Dec. at ¶ 29; Lavelle Dec. at ¶ 24.  Office Depot never enforced those agreements against the former employees.  Id.

Office Depot's practice of not enforcing the restrictive covenants in the employee agreements was even confirmed to Kyle and Lavelle in their direct conversations with Office Depot management (District Service Manager Dave Fisher).  Fisher affirmatively informed Kyle and Lavelle, on different occasions, that Office Depot did not enforce restrictive covenants because it essentially recognized those agreements did not protect a legitimate business interest. Kyle Dec. at ¶ 29; Lavelle Dec. at ¶ 25.  Further, Kyle was told that this practice of not enforcing the provisions was especially true for former employees going to work for independent office suppliers, which Office Depot did not consider to be competitors.  Kyle Dec. at ¶ 30.   Thus, Kyle & Lavelle were affirmatively led to believe as to any other provisions regarding modification of the employment agreements needing to be in writing were superfluous, irrelevant, and of no consequence.

Through both its words and affirmative conduct, Office Depot effectively waived its right to enforce the restrictive covenants contained in the employee agreements. Thus, Office Depot cannot show a substantial likelihood of success on the merits of its breach of contract claim.

### 2. *Office Depot Cannot Establish its Trade Secret Misappropriation Claim Because it Cannot Show Defendants Possess Trade Secrets.*

Office Depot cannot establish a substantial likelihood that it would prevail on the merits of its trade secret misappropriation claim.[6]  Office Depot cannot establish that any information obtained by Defendants Kyle and Lavelle during the course of their employment or at anytime thereafter constitutes a trade secret.  As noted above, a "trade secret" is something that satisfies both of the following: (i) it derives independent economic value from not being generally known to (and not being readily ascertainable by proper means by) other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of efforts that are reasonable under circumstances to maintain its secrecy. Ohio Revised Code § 1333.61(D).  As also explained above, nothing Kyle or Lavelle used in office supply sales was deemed confidential.  On the contrary, customers readily shared competitor information, including pricing and their needs, and Office Depot itself used (and encouraged the use of) competitor information.  Moreover, even if Kyle or Lavelle had been given access to trade secret information while at Office Depot, that information is now (and has been) outdated and stale because Office Depot's pricing and profit margins are updated every month via the cost remediation reports – and Lavelle and Kyle have been gone from Office Depot for over six months.  As such, Office Depot cannot establish by clear and convincing evidence that is will succeed on its trade secret misappropriation claim.

### C.    Office Depot Will Not Suffer Immediate or Irreparable Injury if Injunctive Relief is Denied.

Office Depot cannot show that it will suffer immediate or irreparable injury if injunctive relief is denied. Office Depot claims that it will suffer irreparable injury if Defendants are

---

[6]  To the extent that Plaintiff has alleged common law trade secret misappropriation claims, they cannot show a substantial likelihood of success on the merits of that claim because those claims are displaced and preempted by Ohio's Uniform Trade Secret Act.  Ohio Rev. Code § 1333.67.

permitted to solicit its clients and customers by using "trade secrets, confidential or other proprietary" information.  Plaintiff's Motion at p. 21.  "Merely concluding that irreparable harm will result is not sufficient–the law does not recognize an injunction by accusation."  *Aero Fulfillment Servs., Inc. v. Tartar* 2007 WL 120695 at *4 (2007 Ohio App. 1st Dist.) (applying analogous Ohio Civ. R. 65 and affirming denial of preliminary injunction on a non-compete employment contract).  As explained above, Plaintiff has failed to establish a protectable, legitimate business interest.  Rather, Plaintiff seeks to prevent ordinary competition, for which there is no legally cognizable business interest.  Even if Plaintiff were to have some protectable, legitimate business interest, the harm, if any, that Plaintiff would suffer would be in the form of lost sales resulting from Defendants' activities, which would be easy to calculate.  Accordingly, Office Depot has not shown that it will suffer immediate or irreparable injury.

>    **D.**    **The Issuance of Preliminary or Permanent Injunctive Relief Against Defendants Would Cause Substantial Harm to Defendants.**

By contrast, the issuance of injunctive relief (including any extension of the TRO) against the Defendants will substantially harm the Defendants.  The TRO has made them essentially unemployable in Northeast Ohio.  It has already had an immediate and devastating impact upon Kyle and Lavelle.  They are without any income at Christmas and for the foreseeable future.  Any extension of the TRO would only further such harm and jeopardize any other limited employment opportunities, in such difficult and economic times.

An injunction will also cause them to lose the financial investment both Kyle and Lavelle made to support their current positions with Impact, which includes – in the case of Kyle – the creation of a home office.  Kyle Dec. at ¶ 44.  Accordingly, there are serious questions about the hardship that would fall upon the Defendants and, in turn, their families if this court were to continue the injunction.

**E.** **The Issuance of Preliminary or Permanent Injunctive Relief against Defendants Would Not Serve the Public Interest**

The public interest is not served by restricting free and open competition.  The potential impact of the requested relief on the public interest weighs in favor of protecting the inherent skill of employees and ordinary competition that Office Depot seeks to enjoin.  Specifically, the issuance of the injunctive relief requested by Office Depot would prevent free and open competition within the office supply industry, and customers would be denied the potential benefit of Kyle, Lavelle, and Impact's services in obtaining affordable office supplies.  It would also prohibit clients and customers of Defendants, who have established personal and trusting relationships with Kyle and Lavelle since Kyle and Lavelle's employment with Impact, from continuing to work with them.  Office Depot has failed to present any evidence to satisfy its burden of clear and convincing evidence that it is entitled to injunctive relief.  Therefore, this court should deny its Motion.

**F.** **Office Depot is Barred from Obtaining Equitable Relief by the Doctrine of Unclean Hands.**

Injunctive relief is not available to Office Depot because of its own inequitable conduct.  Equitable relief is not available to a party who comes to court with "unclean hands."  *Goldberger v. Bexley Properties*, 5 Ohio St. 3d 82, 84-85 (1983).  Office Depot is guilty of the same practices of which it is now accusing Defendants, and therefore, cannot now turn around and request injunctive relief to restrain Defendants from the very same acts that itself perpetrates.  Office Depot does not simply turn its corporate cheek at gathering competitor information; it encourages it.

Specifically, Office Depot management encouraged its sales force to gather and use as much competitive information as possible, without regard to other companies' similar restrictive covenants or alleged "trade secrets" or confidentiality concerns.  Kyle Dec. at ¶ 18; Lavelle Dec.

at ¶ 13.  By way of example, upon obtaining an Office Max customer list from a former Office Max employee who joined Office Depot, Office Depot turned around and circulated the list amongst its Northeast Ohio sales reps to specifically use to target for business.  Id.  Office Depot also actively encourages its employees to solicit and use competitor usage reports and pricing when targeting and selling potential customers.  Id.  Indeed, it was recommended and approved to solicit competitor invoices from potential customers.  Id.  Office Depot, therefore, comes to this Court seeking injunctive relief with unclean hands, and consequently, this Court should deny its Motion.

### G.  **Bond**

Rule 65(c) provides that a court may issue a preliminary injunction or temporary retraining order only if the movant gives adequate security in an amount that the court considers proper to pay the costs and damages sustained by any party found that have been wrongfully enjoined or restrained.  In this case, Office Depot seeks to deprive Defendants from what is their sole employment and source of income.  Thus, at a minimum, this Court should require a bond in the amount of the Defendants' anticipated lost profits and lost wages for the remainder of the Defendants' non-compete periods.

## IV.  CONCLUSION

This Court should see Office Depot's lawsuit for what it really is – an inappropriate attempt to prevent two men from using their ordinary skills and know-how to further their careers elsewhere.  Office Depot cannot demonstrate by clear and convincing evidence that it has a legitimate business interest to protect vis-à-vis Kyle and Lavelle.  Thus, the Court should allow Kyle and Lavelle to continue their employment with Impact Office Products unfettered, and deny any further attempts to enjoin them from competing outright against Office Depot.  Any

extension of the TRO or any other injunctive relief is unwarranted.  Plaintiff's motion should be denied and the TRO dissolved.

Respectfully submitted,

/s/ H. Alan Rothenbuecher
H. Alan Rothenbuecher (0041883)
  hrothenbuecher@szd.com
Jay E. Krasovec (0068787)
  jkrasovec@szd.com
Schottenstein Zox & Dunn Co., LPA
US Bank Centre at Playhouse Square
1350 Euclid Ave., Suite 1400
Cleveland, Ohio 44115
Phone: (216) 621-6501
Facsimile: (216) 621-6502

*Attorneys for Defendants*
*Brian Kyle and Patrick Lavelle*

{C0047414.2 }

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of December, 2009, a copy of the foregoing *Memorandum In Opposition To Plaintiff's Motion for Injunctive Relief and Extension of the Temporary Restraining Order* was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ H. Alan Rothenbuecher
H. Alan Rothenbuecher

{C0047414.2 }

33