UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| OFFICE DEPOT, INC., | ) | 1:09CV2791 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SOLOMON OLIVER |
| v. | ) | (Mag. Judge McHargh) |
| | ) | |
| IMPACT OFFICE PROD., LLC, | ) | |
| et al., | ) | |
| | ) | |
| Defendants | ) | REPORT AND |
| | ) | RECOMMENDATION |

McHARGH, MAG. J.

Plaintiff Office Depot, Inc. ("Office Depot") filed a complaint for temporary restraining order, preliminary and permanent injunctive relief, and damages, on Dec. 1, 2009, against defendants Impact Office Products, LLC ("Impact"), Patrick Lavelle ("Lavelle"), and Brian Kyle ("Kyle").  (Doc. 1.)  That same day, Office Depot filed a motion for temporary restraining order and preliminary injunction.  (Doc. 2.)

The court granted the motion, in part, for a temporary restraining order (TRO) on Dec. 4, 2009, which TRO expired ten days later.  (Doc. 11.)  Office Depot filed a motion to extend  the TRO (doc. 15), which was opposed by defendants (doc. 17, 21).  The TRO was not extended.

A mediation conference was scheduled for Feb. 24, 2010, but the conference was scheduled to be continued on April 1, 2010.  (Doc. 22, 32.)  The continuation of the mediation was cancelled on Apr. 9, 2010.  (Doc. 34.)

On July 2, 2010, Office Depot moved to have its motion for preliminary injunction heard before a magistrate judge, which was opposed by defendants. (Doc. 38, 41.)  On July 20, the motion was referred to the undersigned magistrate judge.  A status conference was held on August 4, and a preliminary injunction hearing was scheduled for Oct. 7-8, 2010.

The preliminary injunction hearing was held on Oct. 7-8, and Oct. 26-27, 2010.  At the outset, defendants renewed their objection to the jurisdiction of the magistrate judge.[1]  Testimony was heard and evidence presented.  At the conclusion of the hearing, the court ordered the parties to submit a joint exhibit list, summaries of relevant deposition testimony, and proposed findings of fact and conclusions of law.

The parties have submitted their joint exhibit list.  (Doc. 63.)  Office Depot has submitted summaries of relevant deposition testimony (doc. 64) and proposed findings of fact and conclusions of law (doc. 65).  The defendants have filed proffered deposition testimony of witnesses (doc. 67) and proposed findings of fact and conclusions of law (doc. 66).

Based on the testimony heard and the evidence received at the preliminary injunction hearing, and after considering the additional filings referenced above, the undersigned submits the following Report and Recommendation.

---

[1]  But see North American Products Corp. v. Moore, 196 F.Supp.2d 1217 (M.D. Fla. 2002) (adopting Report & Recommendation of Magistrate Judge).

## STANDARD FOR PRELIMINARY INJUNCTION

Office Depot seeks a preliminary injunction based on covenants not to compete and not to solicit.  The complaint sought the following injunctive relief:

> (1) Awarding preliminary and thereafter permanent injunctive relief against Kyle and Lavelle prohibiting them for a period of six months from the date of this Court's Order, from soliciting or servicing customers of Office Depot, and permanently enjoining them from using or disclosing Office Depot's trade secret and confidential information and from otherwise violating the Employment Agreement in any way;

> (2) Awarding temporary, preliminary and thereafter permanent injunctive relief against Kyle and Lavelle prohibiting them from being employed by or performing services on behalf of [Impact] for six months from the date of this Court's Order;

> (3) Awarding preliminary and thereafter permanent injunctive relief against [Impact] prohibiting it, for a period of six months from the date of this Court's Order, from soliciting or servicing customers of Office Depot, and permanently enjoining it from using or disclosing Office Depot's trade secret and confidential information and from otherwise interfering with Office Depot's contract and relationship with Kyle and Lavelle and its customers[.]

(Doc. 1, at 18-19.)

The motion for a preliminary injunction seeks similar, but more specific, relief:

> (1) Prohibiting Kyle and Lavelle, for a period of six months from the date of this Order, from soliciting or servicing customers of Office Depot or potential customers of Office Depot solicited by Kyle, Lavelle or other Office Depot employees with Kyle and/or Lavelle's knowledge;

> (2) Permanently enjoining Kyle and Lavelle from using or disclosing Office Depot's trade secret and confidential information, and from otherwise violating the Employee Agreement in way;

3

(3) Prohibiting Kyle and Lavelle from being employed by or performing services on behalf of [Impact], within the geographic territory they were assigned by Office Depot, for six months from the date of this Order;

(4) Prohibiting [Impact], for a period of six months from the date of this Order, from soliciting or servicing customers of Office Depot or potential customers of Office Depot solicited by Kyle, Lavelle or other Office Depot employees with Kyle and/or Lavelle's knowledge within the geographic territories worked by Kyle and Lavelle during their employment with Office Depot;

(5) Permanently enjoining [Impact] from using or disclosing Office Depot's trade secret and confidential information and from otherwise interfering with Office Depot's contracts and business relationships with Kyle and Lavelle and its customers; and

(6) Defendants are prohibited from, in addition to the above, directly or indirectly, violating Ohio's Uniform Trade Secrets Act.

(Doc. 2, at 1-2.)

The party seeking the injunction must establish its case by clear and convincing evidence.  Honeywell, Inc. v. Brewer-Garrett Co., 145 F.3d 1331, 1998 WL 152951, at *3 (6th Cir. 1998) (TABLE, text in WESTLAW) (citing Garlock, Inc. v United Seal, Inc., 404 F.2d 256, 257 (6th Cir. 1968)).  Before a preliminary injunction can be issued, the court must consider the following four factors:

1. Whether the movant has shown a likelihood of success on the merits;

2. Whether the movant has shown irreparable injury without the injunction;

3. Whether the preliminary injunction would substantially harm third parties; and

4. Whether the public interest would be served by issuing the preliminary injunction.

4

Yolton v. El Paso Tennessee Pipeline Co., 435 F.3d 571, 578 (6th Cir.), cert. denied, 549 U.S. 1019 (2006); Tumblebus Inc. v. Cranmer, 399 F.3d 754, 760 (6th Cir. 2005), cert. denied, 546 U.S. 824 (2005).

Although the court engages in balancing these four considerations, the movant must always demonstrate some irreparable harm before the injunction will issue.  Friendship Materials, Inc. v. Michigan Brick, Inc., 679 F.2d 100, 104 (6th Cir. 1982); Basicomputer Corp. v. Scott, 791 F.Supp. 1280, 1285 (N.D. Ohio 1991), aff'd, 973 F.2d 507 (6th Cir. 1992).  The Supreme Court has stated that "the basis of injunctive relief in the federal courts has always been irreparable harm and the inadequacy of legal remedies."  Sampson v. Murray, 415 U.S. 61, 88 (1974) (quoting Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506-507 (1959)); Economou v. Physicians Weight Loss Centers of Am., 756 F.Supp. 1024, 1038 (N.D. Ohio 1991). A plaintiff's harm is generally not "irreparable" if it is fully compensable by money damages.  Honeywell, 1998 WL 152951, at *3; Basicomputer Corp. v. Scott, 973 F.2d 507, 511 (6th Cir. 1992).

In outlining the factors to be considered prior to issuing a preliminary injunction, many courts recite that the movant must show a "strong or substantial" likelihood of success on the merits.  See, e.g., Tumblebus, 399 F.3d at 760 ("strong likelihood"); Jones v. City of Monroe, Mich., 341 F.3d 474, 476 (6th Cir. 2003) (same); Hamad v. Woodcrest Condominium Ass'n, 328 F.3d 224, 230 (6th Cir. 2003) ("substantial likelihood"); Neal Publ'ns v. F & W Publ'ns, Inc., 307 F.Supp.2d 928, 930 (N.D. Ohio 2004) ("strong likelihood").

5

However, the proper balancing of hardships allows the court:

> to grant a preliminary injunction even where the plaintiff fails to show
> a strong or substantial probability of ultimate success on the merits of
> his claim, but where he at least shows serious questions going to the
> merits and irreparable harm which decidedly outweighs any potential
> harm to the defendant if an injunction is issued.

Friendship Materials, 679 F.2d at 105.  Accord Six Clinics Holding Corp., II v.

Cafcomp Systems, Inc., 119 F.3d 393, 400 (6th Cir. 1997); In re Eagle-Picher

Industries, Inc., 963 F.2d 855, 860 (6th Cir. 1992).  Generally, the likelihood of

success that needs to be demonstrated "will vary inversely with the degree of injury

the plaintiff will suffer absent an injunction."  Id.  Should Office Depot show a

strong likelihood of prevailing on the merits, that would permit the court to issue an

injunction despite a lesser showing of irreparable harm.  Cabot Corp. v. King, 790

F.Supp. 153, 155 (N.D. Ohio 1992).

## FINDINGS OF FACT

1.  Plaintiff Office Depot is a Delaware corporation, headquartered in Boca Raton,

Florida,  which is involved in the business of selling a broad assortment of office

products and office services, including general office supplies, computer supplies,

business machines, office furniture, copy and print services, technology services,

cleaning and break room supplies, as well as related products and services.  Office

Depot has numerous retail locations nationwide. Office Depot also has a Business

Solutions Division, which sells and provides office supply products and services

directly to businesses.

6

2.  Defendant Brian Kyle was employed by Plaintiff Office Depot, and as a condition of his employment he signed an Associate Non-Competition, Confidentiality and Non-Solicitation Agreement ("Non-Compete Agreement") on March 8, 2003.  (Joint Exhibit ("JX") 3.)

3.  Defendant Patrick J. Lavelle was employed by Plaintiff Office Depot, and as a condition of his employment he signed an Employee Non-Competition, Confidentiality and Non-Solicitation Agreement ("Non-Compete Agreement") on April 25, 2006.  (JX 53.)

4.  The Non-Compete Agreements contain a choice of law provision which dictates that all issues and questions concerning the construction, validity, enforcement and interpretation of the Agreement shall be governed by the laws of the State of Florida.  (JX 3, at ¶12; JX 53, at ¶ 12.)

5.  The Non-Compete Agreement signed by Lavelle contains an additional provision, that the provisions of paragraph 3 "will be enforced to the fullest extent permitted by the law of the state in which [Lavelle] resides at the time of enforcement of the provision."  (JX 53, at ¶ 3.c.)

6.  Both Non-Compete Agreements contain a non-competition provision, which prohibits Kyle and Lavelle from working for competitors of Office Depot for a period of six (6) months following the separation of their employment with Office Depot:

Employee[2] acknowledges that in the course of Employee's employment with the Company, Employee has and will become familiar with the Company's trade secrets and with other Confidential Information concerning the Company and its subsidiaries and that Employee's services shall be of special, unique and extraordinary value to the Company and its subsidiaries. Therefore, Employee agrees that during employment and for six months thereafter (the "Non-compete Period"), Employee shall not directly or indirectly own any interest in, manage, control, or participate in, work for, consult with or render services for office products superstores or contract/commercial stationers within any geographical area in which the Company or its subsidiaries engage or plan to engage in such businesses.  Examples of such competitors currently include but are not limited to Office Max, Staples and Corporate Express.

(JX 3 and 53, at ¶ 3(a).)

7.  Both Non-Compete Agreements also prohibited Kyle and Lavelle from soliciting any of Office Depot's customers for six (6) months after the end of their employment with Office Depot:

While employed by the Company or any subsidiary thereof and for a period of six months after the termination of the Employee's employment, Employee shall not directly or indirectly through another entity . . . (iii) induce or attempt to induce any customer, supplier, licensee, licenser, franchisee or other business relation of the Company or any subsidiary to cease doing business with the Company or such subsidiary, or in any way interfere with the relationship between any such customer, supplier, licensee or business relation and the Company or any subsidiary . . .

(JX 3 and 53, at ¶ 3(b).)

_____

[2]  Kyle's Non-Compete Agreement uses the term "Associate" rather than "Employee."  The court acknowledges this difference, but for simplicity's sake will hereinafter use the term Employee rather than Associate when quoting the Agreements.

8

8.  Both Non-Compete Agreements provide that, "in the event of an alleged breach or violation by Employee of this paragraph 3, the Non-compete Period shall be tolled until such breach or violation has been duly cured."  (JX 3 and 53, at ¶ 3(d).)

9.  Both Non-Compete Agreements contain a provision that limits the use of Office Depot's confidential information:

> Employee acknowledges that the information, observations and data obtained by Employee while employed by the Company and its subsidiaries concerning the business or affairs of the Company or any subsidiary of the Company ("Confidential Information") are the property of the Company or such subsidiary. Therefore, Employee agrees that Employee shall not disclose to any unauthorized person or use for Employee's own purpose any Confidential Information without the prior written consent of the Company, unless and to the extent that the aforementioned matters become generally known to and available for use by the public other than as a result of Employee's acts or omissions.

(JX 3 and 53, at ¶ 1).

10.  Both Non-Compete Agreements required Kyle and Lavelle to return all confidential and proprietary information of Office Depot upon their separation of employment:

> Employee shall deliver to the Company at the termination of Employee's employment, or at any other time the Company may request, all memoranda, notes, plans, records, reports, computer tapes, printouts and software and other documents and data (and copies thereof) relating to the Confidential Information, Work Product (as defined below) or the business of the Company or any subsidiary which Employee may then possess or have under Employee's control.

(JX 3 and 53, at ¶ 1).

11.  Both Non-Compete Agreements provide that the "Agreement may be amended or waived only with the prior written consent of the Company and Employee, and

9

no course of conduct or failure or delay in enforcing the provisions of the Agreement shall affect the validity, binding effect or enforceability of this Agreement."  (JX 3 and 53, at ¶ 13).

12.  At the time that Kyle was hired by Office Depot, he had approximately five years of sales experience at Pitney-Bowes, and had been trained in a sales technique called Fact Finder.  He continued to apply this technique at Office Depot.  (Doc. 61, Hearing Transcript ("Tr."), at 589-590.)  At Office Depot, Kyle participated in additional training which was offered by the company, although he did not consider it to be useful.  (Doc. 59, Tr., at 11-16, 25-26.)

13.  Kyle was hired by Office Depot in March 2003 as an account manager.  Kyle was promoted several times, and by late 2006 he held the position of Business Development Manager-Major Accounts for Northeast Ohio.  His sales territory ran from Sandusky east to Pennsylvania, and from the southern border of Richland County to Lake Erie.  His primary duty was to solicit sales from businesses that had annual purchases of office supplies over $150,000.  Kyle was considered an "excellent" sales performer, who achieved an "outstanding" performance of his sales targets.  (Doc. 60, Tr., at 279.)

14.  Kyle testified that he would identify target customers by reviewing public materials, including Crain's Cleveland Business Book of Lists, the Yellow Pages, and internet sites.  After Kyle identified a potential customer, he would either call or visit the target customer, asking for the name of the person responsible for the purchase of office supplies.  If he was able to make contact, he would discuss with

10

that person the company's office supply needs.  If the target customer was interested in receiving a quote for office supplies, Kyle asked for any reports the target customer had regarding its usage of office supplies (often referred to as "usage reports") and for its current vendor's pricing.  (Doc. 61, Tr., at 588-589.)  All parties agreed that usage reports and vendor pricing were routinely shared by customers to attempt to obtain competitive pricing.  See generally doc. 57 (joint stipulation).

15.  At the time that Lavelle was hired by Office Depot, he had sales experience at New York Life and Guide Book Publishing.  ((Doc. 61, Tr., at 459-460.)  At Office Depot, Lavelle participated in additional training which was offered by the company, although he did not consider it to be useful.  (Doc. 59, Tr., at 138-146.)

16.  Lavelle was hired by Office Depot as a Business Development Manager in March 2006.  In Dec. 2008, Lavelle became Territory Development Manager responsible for the sales territory including the Akron-Canton-Youngstown market.  Lavelle's target customers were businesses that had annual purchases of office supplies under $150,000.  Lavelle followed a similar routine to Kyle in attempting to solicit sales.  (Doc. 61, Tr., at 461-463.)  Lavelle was the top sales performer in the northeast Ohio district.  (Doc. 60, Tr. at 394-395.)

17.  Both Kyle and Lavelle worked out of their homes, and kept their files of usage reports, customer invoices, proposals to potential customers, and similar business files at their homes.  Office Depot did not discourage or prevent them from doing so.  (Doc. 61, Tr., at 469-471, 596-597, 600-601.)

11

18.  Although Kyle and Lavelle were employed by Office Depot to solicit customers for Office Depot, both men considered these business files and client accounts to be their personal property.  (Doc. 59, Tr., at 34, 178, 236-237.)  They describe themselves as "owners of the documents they controlled at Office Depot."  (Doc. 66, at 7 n.1.)

19.  In addition to the confidentiality provisions in the Non-Compete Agreements, Office Depot promulgated numerous policies intended to prevent the disclosure of its confidential, proprietary information and trade secrets to competitors and others.  Computer users were reminded of Office Depot confidentiality policies each time they logged into an office computer.  See, e.g., JX 6.  Confidentiality provisions were included in the Associate Handbook, Code of Ethical Behavior, Information Security Handbook and Global Information Security Policy, all of which were distributed to Office Depot employees.  Online training in these policies was offered as well.

20.  Kyle and Lavelle chose not to familiarize themselves with the confidentiality provisions of Office Depot while they were employed there, and claimed that they completed the online training by filling in answers provided by others who had already completed the training.  (Doc. 59, Tr., at 25-31, 147-154.)

21.  Office Depot's Information Security Handbook provides that:  "By default, any unmarked or unclassified information is classified as internal use only until the business owner assigns a classification."  (JX 57, at 20.)

22.  Office Depot's Global Information Security Policy provides that:  "By default, all unmarked or unclassified information should be considered classified as "Confidential" until the owner of the information determines further classification." (JX 99, at 18.)

23.  Office Depot's Global Information Security Policy provides a brief description of "Confidential" information:

> All documents are confidential unless deemed public or restricted. Documents that contain business related information and are not publicly disclosed should always be classified as confidential. Confidential documents must be maintained in a manner that ensures that they are not disseminated to third parties.  For example, confidential paper documents must not be left in common areas, such as conference rooms, and must not be kept in plain view in workplaces.

(JX 99, at 17.)  Examples of confidential documents included but are not limited to:

> Contracts; Internal memos; Meeting minutes; Customer lists; Business, sales, pricing and marketing plans; Product strategies; Documents including operations and technical information; Vendor lists; Most business related correspondence and emails.

(JX 99, at 17.)

24.  It is uncontested that none of the Office Depot documents that Kyle and Lavelle used in their day-to-day dealing were marked as "confidential."  Pricing information in particular was fluid, and often individualized by customer.

25.  The parties filed an Agreed Stipulation:

> . . . that prospective and existing customers in the office supply industry share usage reports and invoices at their discretion.  The usage reports and invoices include a variety of the following information in varying degrees:

   a. Price currently paid for office products and services to the customer's current vendor (which sometimes may include discounts, payment terms, account payment summaries/history, and other incentives and promotions).

   b. Product/item description (which sometimes may include alternative products and their prices, product code, product categories and quantity of the products purchased by the customer).

   c. Customer particulars (which sometimes may include customer contact information, shipping, details and terms, and claims procedure for returning purchased goods).

(Doc. 57, at 1; see, e.g., doc. 59, Tr., at 35-36.)

26.  While a customer may provide a competitor's pricing information, Impact's Vice President testified that he would not want his salespeople to share specific discounts for specific customers directly with the competition.  (Doc. 60, Tr., at 347-348.)

27.  Defendant Impact Office Products is a supplier of office products and services. Impact sells a broad assortment of office supplies, office furnishings and interiors, technology products, printing and promotional products and coffee break room supplies.  Impact describes itself as "a leading national supplier of office commodities, furniture, and technology products."  (Doc. 60, Tr., at 304.)  Impact does not sell any products which would not be available through Office Depot.  Id. at 320-321; see also doc. 59, Tr., at 236-237; doc. 60, Tr., at 349; doc. 51, PX F, Flynn dep., at 68.

14

28.  In April 2009, while they were still employed by Office Depot, Kyle and later Lavelle were contacted by Steve Stadell ("Stadell"), a recruiter working for Impact. (Doc. 59, Tr., at 180; doc. 60, at 311; doc. 61, Tr., at 605.)

29.  Impact, prior to its hiring of Kyle and Lavelle, did not have any sales presence in Ohio.  (Doc. 59, Tr., at 59-60; doc. 60, Tr., at 309.)

30.  Kyle and Lavelle presented Impact with an attractive option to penetrate the Ohio market with minimal start up costs, expenses and marketing.  (Doc. 59, Tr. at 59-60; doc. 60, Tr. at 310-311.)

31.  Impact concedes that it was attempting to achieve a strategic competitive advantage in entering the Ohio market when it hired Kyle and Lavelle.  (Doc. 51, PX F, Flynn dep., at 64-65; see also doc. 59, Tr., at  59-60.)

32.  Impact acknowledges that it knew that Kyle and Lavelle would convert Office Depot clients immediately upon starting employment with Impact.  (Doc. 60, Tr., at 316-317.)

33.  Shortly after the receipt of their resumes, on or about April 21, 2009, Impact asked for copies of, and examined, Kyle and Lavelle's Non-Compete Agreements. (JX  15-16; doc. 51, PX F, Flynn dep., at 46-48; Doc. 59, Tr. at 58-59; 183.)

34.  Impact, after reviewing the Non-Compete Agreements, acknowledged that the six month Non-Competition and Non-Solicitation period was "not that long." (Doc. 59, Tr. at 61, 183.)  Impact's own employment agreements impose twelve month restrictive covenants.  (JX 112-113.)

15

35.  After reviewing the Non-Compete Agreements, Impact represented to the Kyle and Lavelle that it would "have their backs" if their employment with Impact were ever challenged by Office Depot. (Doc. 59, Tr., at 60-63; 183.)

36.  Following their initial meeting, Lavelle — through the executive recruiter, Stadell — provided Impact on May 12, 2009, with a list of "Guaranteed Business" and a list of "Strong Possibilities" of business which he thought he could bring with him to Impact from Office Depot.  (JX 19.)

37.  In this document, Lavelle guaranteed that he would be able to convince at least forty Office Depot customers with total businesses of approximately $529,000.00 to start purchasing products from Impact, instead of Office Depot, within the first several months of employment.  In addition, Lavelle also represented that seven Office Depot customers with total businesses of approximately $540,000.00 were "strong possibilities" to defect to Impact if Lavelle was hired by Impact.  (JX 19.)

38.  Lavelle provided this list of guaranteed and strong possibilities because he understood there was an interest from Impact regarding how much business Lavelle could bring with him from Office Depot.  (Doc. 59, Tr. at 185-186; doc. 51, PX C, Lavelle dep., at 83.)

39.  In addition, while they were still employees of Office Depot, both Kyle and Lavelle stalled on closing significant deals, and were laying the groundwork to divert Office Depot customers to Impact.

40.  Lavelle admitted that he was "putting off opportunities" and had already talked to Office Depot customers about switching to Impact while he was still employed at

16

Office Depot: "I need a pretty firm idea by the 1st as to if this is going to happen or not. There is great interest from my current base and former accounts that will come on board. I have put off a few opportunities (new business) as I am trying to gauge what is going to happen." (JX 63).

41. In one instance, Lavelle claimed that he was only delaying preparing the paperwork to open accounts for the benefit of Office Depot and the customer because he did not think it was beneficial — for Office Depot or the customer — to open an account only for him to leave shortly thereafter. Supposedly, he was delaying opening the accounts, so that he could give these accounts to another Office Depot sales representative to open and service upon his departure from Office Depot. (Doc. 59, Tr. at 205-206.)

42. The Court finds Lavelle's testimony on this issue to be dubious. Lavelle specifically testified that all customers he generated while working at Office Depot were "my clients." (Doc. 59, Tr. at 178.) In addition, the context of his communicating to the recruiter that he had "put off a few opportunities (new business)," coupled with his mention of "great interest" from current and prospective clients, would cast doubt on his explanation that any delay was done for the benefit of Office Depot. (JX 63.)

43. Likewise, Kyle was stalling on closing deals in anticipation of his start date with Impact, and tried to share information about at least one bid he was working on for Office Depot with Impact. (Doc. 59, Tr., at 81.) Specifically, he stated in one e-mail, "Be more general when you speak to me thru my work e-mail. I could not

hold them off that long.  How ever long whatever that would be.  I already started to stall when I thought May 27th was a go."  (JX 22.)

44.  The customer under discussion in that email was OMNOVA.  Evidence demonstrates that even though OMNOVA asked Office Depot — through Kyle — to provide it with a proposal for an "evergreen" contract (JX 22), Kyle did not submit one to it.  Instead, he took with him all documents related to OMNOVA, including the bid he prepared on behalf of Office Depot, and used that information to submit a bid to OMNOVA on behalf of Impact within the first two days of his employment with Impact.  (Doc. 59, Tr., at 74-77, 88-89, 91; JX SS, H, 48.)

45.  Kyle claimed that he did not stall on closing the OMNOVA deal on behalf of Office Depot, but instead did everything he possibly could to close the OMNOVA account.  He testified that he did not submit a contract to OMNOVA while at Office Depot because the decision maker at OMNOVA was out on leave. (Doc. 61, Tr., at 607.)  However, if Kyle believed that the OMNOVA deal could not be consummated because the decision maker was out on leave, he would not have immediately reached out to OMNOVA — within a matter of days — after he started his employment with Impact.  (Doc. 59, Tr., at 89.)

46.  The court also notes that, despite the medical leave issue, OMNOVA still invited Kyle to "prepare and submit a proposal" in the meantime on behalf of Office Depot.  (JX 22.)

47.  Therefore, the evidence demonstrates that Kyle and Lavelle stalled on closing

deals on behalf of Office Depot, and were laying the groundwork to convert Office Depot customers to Impact while still employed by Office Depot.

48. Beginning in April 2009, and continuing up until the day he resigned, June 5, 2009, Kyle copied, downloaded and e-mailed to his home e-mail address, and to Lavelle, documents containing pricing and other sensitive information regarding Office Depot's current and prospective customers and businesses. (See, e.g., doc. 59, Tr., at 66-74; JX 12, 13, 32, 36, 37, 47, 48, 74, 75, 124, E, F, G, H, I.)

49. These documents included numerous data which would assist Kyle and Lavelle in diverting customers. These included a target list of customers, the status of those customers' relationship with Office Depot, their forecasts, potential value of those accounts, revenue generation data for customers, profit dollars for customers, profit percentage for customers, purchasing history of customers, margin information of customers, sales data provided to and from customers and scores of other data and information that would provide them with the ability to "hit the ground running" in immediately competing with Office Depot. (Doc. 60, Tr., at 419-426.)

50. Although Kyle and Lavelle downplay the usefulness or significance of these documents, the court notes that Kyle took the time to transfer copies of some of these documents on his final day at Office Depot (June 5, 2009), as well as earlier that spring. Kyle did indicate to Lavelle that the documents he e-mailed to Lavelle might be useful to him at Impact. (Doc. 59, Tr., at 211-212.)

51.  In fact, Kyle admitted that some of the data contained in the documents did have current information about accounts (potential and active), which were "still in play" with Office Depot.  (Doc. 61, Tr., at 675-678.)

52.  In order to deceive Office Depot about their future employment with Impact, a direct competitor moving into the Ohio market, Kyle and Lavelle concealed from Office Depot where they were headed and orchestrated their resignation dates to occur a week apart.  (See, e.g., JX 28.)

53.  When Kyle and Lavelle did resign from Office Depot, they concealed from Office Depot where they were headed and orchestrated their resignation dates a week apart.  (JX 28.)  Office Depot was thus unaware that Kyle and Lavelle would be working for a new direct competitor of Office Depot in the northeast Ohio region.

54.  Kyle signed an offer letter for employment with Impact on June 2, 2009.  (JX 26; doc. 58, Tr., at 92.)  His start date at Impact was set for June 15.  (JX 26.)  Arrangements were made for him to fly to Maryland for training.  (JX 27; doc. 58, Tr., at 94.)  He resigned his position at Office Depot on June 5, 2009.  (JX 29.)

55.  Although Kyle had already accepted the offer of employment from Impact, when his supervisor, Jeff Gagliardo ("Gagliardo"), asked him about his future plans, Kyle told him he "was going to spend time with [his] family and perhaps work for Iron Mountain."  (Doc. 59, Tr., at 96; doc. 60, Tr., at 283-284.)  He did not mention that he was going to begin working at Impact, a direct competitor, in ten days.

56.  Iron Mountain is not an office supplies company.  Iron Mountain is a document management company, which provides document storage and disposal (shredding)

solutions.  Iron Mountain is not a competitor of Office Depot.  (Doc. 59, Tr., at 97; doc. 60, Tr., at 284-285.)

57.  Lavelle signed an offer letter for employment with Impact on June 2, 2009.  (JX 65; doc. 59, Tr., at 175.)  His start date at Impact was set for June 15.  (JX 65.) Arrangements were made for him to fly to Maryland for training.  (JX 27-28; doc. 59, Tr., at 174.)  He resigned his position at Office Depot on Friday, June 12, 2009. (Doc. 59, Tr., at 175; JX 66.)

58.  Although Lavelle had already accepted the offer of employment from Impact, when his supervisor, David Fisher ("Fisher"), asked him about his future plans, Lavelle told him he had "a couple of opportunities out there."  At the hearing, Lavelle did not recall whether he had mentioned an interview at a company called EMC.  He did tell Fisher that he had a sister living in Charlotte, North Carolina, who had a desire to open a restaurant and asked him to invest in it.  (Doc. 59, Tr., at 173, 177; doc. 60, Tr., at 397; doc. 61, Tr., at 717.)  Lavelle also told Fisher that he might get involved in a local pizzeria in the Cleveland area.  (Doc. 60, Tr., at 397; doc. 61, Tr., at 717.)

59.  Lavelle also mentioned to Fisher that he might be working short-term in sales, but not for a competitor, although there might be a few situations where a few products might compete with Office Depot.  (Doc. 60, Tr., at 397-398; doc. 59, Tr., at 176.)  He did not mention that he was going to begin working at Impact, a direct competitor, on the following Monday.

60. Upon commencement of their employment by Impact, Kyle and Lavelle became Impact's first two employees in the Ohio market.  With their sales experience and extensive contacts among customers, they were able to hit the ground running and immediately started pitching sales for Impact in Ohio.

61. On their first day of employment for Impact, Stadell contacted Impact to make sure Kyle and Lavelle received the Blackberries that had been expected to be delivered the previous Friday.  (JX 30.)  "They need them to contact their customers today and tomorrow."  (JX 30; see generally doc. 59, Tr., at 34, 178, 236-237.)  The phones were delivered that same day, June 15.  (JX 30.)

62. Within the first six months of their employment at Impact (the Non-Competition and Non-Solicitation period set forth in their respective agreements),  Kyle and Lavelle attempted to solicit and divert numerous Office Depot clients and customers to Impact.

63. Kyle admitted that he contacted at least nine Office Depot customers (and made sales to at least seven of them) — all of which occurred within the first six months of his employment with Impact.  (Doc. 59, Tr., at 98-100; JX 51, 33).

64. Lavelle also conceded that he contacted at least thirty-five Office Depot customers within the first six months of his employment with Impact and according to Lavelle's own testimony forty-one of Lavelle's fifty-four total sales for Impact were to former Office Depot customers.  (Doc. 59, Tr., at 244-249; JX 85; see also doc. 61, Tr., at 521-524; JX CCC.)

65.   Impact's records show that a majority of these customers started purchasing products from Impact within the first six months of Kyle and Lavelle's employment with Impact and they continue to purchase products from Impact.  (Doc. 62, Tr., at 896-897; JX MMM).

66.  Office Depot did not initially realize that Kyle and Lavelle had gone to work for Impact.  In mid-September 2009, Gagliardo learned that Kyle and Lavelle were competing against Office Depot.  (Doc. 60, Tr., at 285.)

67.  On October 7, 2009, Gagliardo notified Office Depot's Human Resources Manager that Kyle and Lavelle were working for Impact.  (Doc. 60, Tr., at 285; JX A.)  Subsequently, on Oct. 14, Jason Nickerson, counsel for Office Depot, sent cease and desist letters to Kyle and Lavelle, reminding them of their obligations concerning the Non-Compete Agreements. (JX 42, 73.)  The next day, Oct. 15, 2009, Nickerson sent a notification to Tim Flynn, President of Impact, notifying him of the Non-Compete Agreements, and Office Depot's concern that Kyle and Lavelle might be in violation.  (JX 125.)

68.  Fisher testified that he missed certain clues which would have alerted him earlier that Lavelle was competing against Office Depot.  He said that Office Depot was short-staffed, with two territory positions open that he was trying to fill, and he was preoccupied with "a couple of major contract negotiations that were taking a great deal of my time and focus."  (Doc. 60, Tr., at 405-408.)

69.  For example, a communication was sent to Fisher on Aug. 12, 2009, concerning a customer who was extremely upset about a billing issue.  The note mentioned that

23

Patrick Lavelle was still listed as the account manager. In passing, the note also mentioned that "Patrick Lavelle is no longer with OD, but has contacted her to switch companies." (JX N.) Fisher testified that he was probably "speed-reading" when he read this note, and already knew that Patrick Lavelle was no longer at Office Depot. (Doc. 60, Tr., at 407-408.)

70. Lavelle had been the biggest sales producer in his area. Office Depot interviewed a number of candidates, but was not able to replace him until 75 days had passed after his departure. (Doc. 62, Tr., at 750-751.)

71. Impact knew before hiring Kyle and Lavelle of their intent to violate their Non-Competition and Non-Solicitation commitments, and ignored the Oct. 15, 2009, cease and desist letter it received from Office Depot. (Doc. 60, Tr., at 315-317; 376-378.)

72. The court's Temporary Restraining Order of Dec. 4, 2009, enjoined not only Kyle and Lavelle, but Impact Office Products, as to the restrictions imposed during its ten-day pendency. (Doc. 11, at 4.) For example, Impact was prohibited from "soliciting or servicing customers of Office Depot or potential customers of Office Depot." Id.

73. There is some evidence that Impact continued to service the Office Depot customers which Kyle and Lavelle diverted in violation of the Non-Compete Agreements during the TRO period. (JX 80-84; doc. 59, Tr., at 257-259; see generally Tr., at 248.)

24

74.  The vast majority of accounts converted occurred during the first six months after Kyle and Lavelle left Office Depot, and the testimony revealed that defendants continued to service the customers they had already converted from Office Depot throughout this period.  At the hearing, Kyle testified:

> Q.  . . . so the record is clear, the business that you managed to convert from Office Depot to Impact Office Products and the business that Mr. Lavelle managed to convert during that first six months, you continued to service those customers, other than the couple-week period that there was an order in effect, correct?
>
> A.  I can only speak for myself.
>
> Q.  Sure.
>
> A.  I serviced all of my accounts other than the period I was told that I could not, I was refrained from working.

(Doc. 59, Tr., at 131.)

75.  Lavelle testified that he refrained from pursuing new business from Office Depot customers for approximately six months, beginning at some point in December 2009 and ending June 2010.  He also said:

> Q.  . . . so for that six month period, you were continuing to invoice – that majority of your book that you converted from Office Depot, you continued to invoice or expand that book of business, right?
>
> * * * * *
>
> A.  If they were already on the books –
>
> Q. If they were already on the books.
>
> A.  – they were still serviced.

(Doc. 59, Tr., at 131.)

25

76.  It is undisputed that a change of the compensation scheme at Office Depot led to dissatisfaction on the part of Kyle and Lavelle, which led them to be open to leaving.  See, e.g., doc. 60, Tr., at 426-427; doc. 61, Tr., at 485, 616, 708.  Even Fisher was unhappy about it, and considered his options for other employment.  Id. at 429; doc. 61, Tr., at 556.

77.  In the context of this dissatisfaction, during a personal conversation with Lavelle, Fisher mentioned his belief that "the people who make the highest money I felt were working for independent contract stationers."  (Doc. 60, Tr., at 429.) Nonetheless, Fisher wanted Lavelle to remain with Office Depot because Lavelle was his top performer.  Id.

78.  Speaking from his personal knowledge, and not on behalf of Office Depot, Fisher stated "the company, to my knowledge, had not enforced the non-compete, but I also stated that the company always has reserved the right to do so if they chose to."  (Doc. 60, Tr., at 433; see also doc. 61, Tr. at 709.)  At the time Lavelle resigned, Fisher reminded him of his obligations under the Non-Compete Agreement.  (Doc. 59, Tr., at 218-219; doc. 60, Tr., at 398.)

79.  Fisher testified that he had no authority to provide written consent to waive the terms of the Non-Compete Agreements.  (Doc. 60, Tr., at 437.)  No evidence was presented that Kyle or Lavelle sought the written consent of Office Depot to waive or amend the Non-Compete Agreements which they had signed.  See generally JX 3 and 53, at ¶ 13.

26

80.  Evidence was produced of other former Office Depot employees who left to work for companies either not related, or tangentially related, to Office Depot's core business.  The Non-Compete Agreement was not pursued in the cases discussed.

81.  For example, Courtney Barrow was a former Office Depot furniture account manager.  Office Depot had been trying to grow their furniture business, but then significantly reduced their staff in that area.  Barrow's position was eliminated, and she was given a separation package.  (Doc. 60, Tr., at 442.)

82.  Barrow subsequently went to work for Ohio Desk.  (Doc. 60, Tr., at 443.)  Ohio Desk worked with large projects involving design services, contractors and architects.  Id. at 442.  In contrast, Office Depot sold small items like chairs and filing cabinets.  Id. at 442-443.  Fisher had no knowledge of Barrow converting any Office Depot customers during her first six months at Ohio Desk.  Id. at 443.

83.  No evidence was presented of a former Office Depot employee, especially one of the top producers in his area, who went to work for a direct competitor and converted dozens of accounts, as to whether or not that Non-Compete Agreement was enforced.

84.  Fisher testified that, in his opinion, had the six-month non-compete/ non-solicitation period been observed by Kyle and Lavelle,

> [they] certainly wouldn't have taken all this business from us in the first six months.  It would have given us an opportunity to have hired a new salesperson, to get that person trained, and at least give the a chance to introduce themselves to their customers and to hopefully sustain a relationship with them.

(Doc. 60, Tr., at 448-449.)

85.  In response to a question concerning the relief sought by Office Depot ("to prospectively take Mr. Lavelle and Kyle out of the game in this territory for six months"), Fisher testified that "it will give us a chance to go back in and hopefully re-secure this business that we once had."  (Doc. 60, Tr., at 449.)


## CONCLUSIONS OF LAW

### Choice of Law

1.  This action is before the court under its diversity jurisdiction.  In a diversity action, the district court applies the choice of law rules of the state in which it sits. Miller v. State Farm Mut. Auto. Ins. Co., 87 F.3d 822, 824 (6th Cir. 1996); National Union Fire Ins. Co. v. Watts, 963 F.2d 148, 150 (6th Cir. 1992).  Under Ohio choice of law rules, the Ohio Supreme Court strongly favors upholding the chosen law of the parties.[3]  Cincinnati Gas & Elec. Co. v. Westinghouse Elec. Corp., 165 F.3d 26, 1998 WL 661142, at *2 (6th Cir. 1998) (TABLE, text in WESTLAW); Tele-Save Merchandising Co. v. Consumers Distrib. Co., Ltd., 814 F.2d 1120, 1122 (6th Cir. 1987) (citing Schulke Radio Prods., Ltd. v. Midwestern Broadcasting Co., 6 Ohio St.3d 436, 438-439, 453 N.E.2d 683 (1983)).

---

[3]  Neither party argues that either of the following exceptions apply: "unless the chosen state lacks a substantial relationship to the parties or the transaction or unless the application of the law of the chosen state would be contrary to a fundamental policy of a state with a materially greater interest in the transaction." Cincinnati Gas, 1998 WL 661142, at *2.

2.  The Non-Compete Agreements contain a choice of law provision which dictates that all issues and questions concerning the construction, validity, enforcement and interpretation of the Agreement shall be governed by the laws of the State of Florida.  (JX 3 and 53, at ¶ 12.)

3.  The Non-Compete Agreement signed by Lavelle contains an additional provision, that the provisions of paragraph 3 "will be enforced to the fullest extent permitted by the law of the state in which [Lavelle] resides at the time of enforcement of the provision."  Lavelle resides in Ohio, thus the enforcement of any provision of paragraph 3 will be enforced to the fullest extent permitted by the law of Ohio.[4]

### Non-Compete Agreements under Florida Law

4.  The State of Florida governs covenants not to compete under Florida Statutes (Fla. Stat.) § 542.335 (Valid restraints of trade or commerce).

5.  The Florida statute has several prerequisites in any action concerning the enforcement of a restrictive covenant.  First, the court "shall not enforce a restrictive covenant unless it is set forth in a writing signed by the person against

---

[4]  The defendants assert that "Ohio law has no material distinction with Florida law," and thus the court should apply Ohio law.  (Doc. 66, at 24 n.1.) However, the court upholds the choice of law provision, which dictates that Florida law governs.  (JX 3 and 53, at ¶ 12.) Although defendants argue that Ohio does not favor restrictive covenants, doc. 66, at 25, neither does Ohio prohibit them.  See, e.g., Lake Land Emp. Group of Akron, LLC v. Columber, 101 Ohio St.3d 242, 244, 804 N.E.2d 27, 30 (2004) (modern economic realities do not justify strict prohibition of noncompetition agreements); see also Rogers v. Runfola & Assoc., Inc., 57 Ohio St.3d 5, 565 N.E.2d 540 (1991); Raimonde v. Van Vlerah, 42 Ohio St.2d 21, 325 N.E.2d 544 (1975).

whom enforcement is sought."  Fla. Stat. § 542.335(1)(a); see, e.g., Milner Voice &

Data, Inc. v. Tassy, 377 F.Supp.2d 1209, 1217 (S.D. Fla. 2005).

6.  It is uncontested that Kyle and Lavelle signed the Non-Compete Agreements.

7.  The second prerequisite is that the party seeking enforcement "shall plead and

prove the existence of one or more legitimate business interests justifying the

restrictive covenant."  Fla. Stat. § 542.335(1)(b); see, e.g., Milner, 377 F.Supp.2d at

1217-1218.

8.  Office Depot's complaint alleges that the Non-Compete Agreements are

"reasonable and necessary to protect Office Depot's legitimate protectable interests

in its confidential information and its customer relationships."  (Doc. 1, Compl., at ¶

62.)  In its motion, Office Depot asserted that the protections in the Non-Compete

Agreements are essential, otherwise former employees like Kyle and Lavelle "will

be able to successfully raid Office Depot's customers and steal confidential and

proprietary information, thereby irreparably damaging Office Depot."  (Doc. 2, at 7.)

9.  Under the Florida statute, the term "legitimate business interest" includes trade

secrets, "[v]aluable confidential business or professional information that otherwise

does not qualify as trade secrets," and substantial relationships with specific

prospective or existing customers.  Fla. Stat. § 542.335(1)(b); North American

Products Corp. v. Moore, 196 F.Supp.2d 1217,1228 (M.D. Fla. 2002); Milner, 377

F.Supp.2d at 1217.

10.  Under the Florida statute, a protectable "legitimate business interest" includes:

"Substantial relationships with specific prospective or existing customers, patients,

30

or clients." Fla. Stat. § 542.335(1)(b).  "There is little question under Florida law that an employer has a legitimate business interest in prohibiting solicitation of its customers with whom the employee has a substantial relationship."  North American Products, 196 F.Supp.2d at 1228.

11.  Office Depot has pled and proved the existence of legitimate business interests justifying the Non-Compete Agreements.

12.  The Florida statute provides:

> A court shall construe a restrictive covenant in favor of providing reasonable protection to all legitimate business interests established by the person seeking enforcement.  A court shall not employ any rule of contract construction that requires the court to construe a restrictive covenant narrowly, against the restraint, or against the drafter of the contract.

Fla. Stat. § 542.335(1)(h); see, e.g., Milner, 377 F.Supp.2d at 1216.

13.  Finally, a party seeking enforcement "shall plead and prove that the contractually specified restraint is reasonably necessary to protect the legitimate business interest or interests justifying the restriction."  Fla. Stat. § 542.335(1)(c).

14.  In the case of a restrictive covenant sought to be enforced against a former employee, "a court shall presume reasonable in time any restraint 6 months or less in duration."  Fla. Stat. § 542.335(1)(d)(1).

15.  The Non-Compete Agreements specify a six-month non-compete period, and are thus reasonable in time.

16.  The Non-Compete Agreements provide that a former employee cannot work, or render services, "for office products superstores or contract/commercial stationers

31

within any geographical area in which the Company or its subsidiaries engage or plan to engage in such businesses."  (JX 3 and 53, at ¶ 3(a).)

17.  Florida law does not require a court to refuse to enforce a restrictive covenant merely because the geographic area may be unreasonable.  Environmental Serv., Inc. v. Carter, 9 So.3d 1258, 1264 (Fla. Dist. Ct. App.  2009); Health Care Fin. Enter., Inc. v. Levy, 715 So.2d 341, 342 (Fla. Dist. Ct. App. 1998).  Rather, if necessary, the court should determine a reasonable geographic restriction, if the covenant is otherwise reasonable.  Health Care Fin., 715 So.2d at 342; see generally Fla. Stat. § 542.335(1)(h).  See also JX 3 and 53, at ¶ 7 (severability) and ¶ 9 (no strict construction).

18.  Office Depot does not seek to enforce the Non-Compete Agreements geographically as broadly as written.  Rather, Office Depot seeks to enforce the Non-Compete Agreements  against the Defendants "within the geographic territories worked by Kyle and Lavelle during their employment with Office Depot." (Doc. 2, at 2, ¶¶ 3-4.)  The court finds the Non-Compete Agreements, as sought to be enforced, to be reasonable in geographic area.

19.  The Non-Compete Agreements prohibit a former employee from working for, or rendering services for, "office products superstores or contract/commercial stationers" during the six month non-compete period.  (JX 3 and 53, at ¶ 3(a).)

20.  The terms "office products superstores or contract/commercial stationers" are not defined in the Non-Compete Agreements.  "Examples of such competitors

currently include but are not limited to Office Max, Staples and Corporate Express."
(JX 3 and 53, at ¶ 3(a).)

21.  Where there is no definition of a disputed word in a contract, as here, the court
determines the common meaning or common understanding of a word by reference
to standard dictionaries.  See, e.g., Amoco Prod. Co. v. Southern Ute Indian Tribe,
526 U.S. 865, 874-875 (1999); Victor v. Nebraska, 511 U.S. 1, 16 (1994); Reiter v.
Sonotone Corp., 442 U.S. 330, 338 (1979).  The court will also consider the
testimony on its use in the trade.

22.  The dictionary definition of "stationer" in this context is "a person who sells
office supplies, greeting cards, some books, etc."  Webster's New World College
Dictionary 1400 (4th ed. 2007).  See also doc. 60, Tr., at 301, 385.

23.  The uncontested evidence established that Impact is not an "office products
superstore," which connotes a retail office supplies store open to the general public.
However, the evidence presented established that Impact is a "contract/commercial
stationer."  See, e.g., doc. 60, Tr., at 385.  It is uncontested that Impact is a direct
competitor which competes with Office Depot in selling office supplies and related
products to a range of businesses and institutions.

24.  The court finds that the Non-Compete Agreements are reasonable as to "line of
business" in restricting a former employee from working for, or rendering services
for, direct competitors, such as, "office products superstores or contract/commercial
stationers" during the six month non-compete period.

25.  The court finds that Office Depot has proved the existence of legitimate business interests justifying the Non-Compete Agreements, and has proved that the contractually specified restraints are reasonably necessary to protect the legitimate business interests justifying the restriction.

26.  In addition, the court notes that, under Florida law, "absent a showing of fraud or mental incompetence, a person who signs a contract cannot avoid [his] obligations under it by showing that [he] did not read what [he] signed."  Coleman v. Prudential Bache Securities, Inc., 802 F.2d 1350, 1352 (11th Cir. 1986); Rollins, Inc. v. Heller, 454 So.2d 580, 584 n.3 (Fla. Dist. Ct. App. 1984) (citing Allied Van Lines, Inc. v. Bratton, 351 So.2d 344 (1977); All Florida Surety Co. v. Coker, 88 So.2d 508 (1956)).  See also Upton v. Tribilcock, 91 U.S. 45, 49-50 (1875).

27.  Under Florida law, a purported reliance on alleged oral representations which contradict the express terms of the agreement is unreasonable as a matter of law. Linville v. Ginn Real Estate Co., LLC, 697 F.Supp.2d 1302, 1308-1309  (M.D. Fla. 2010) (party who signs agreement is presumed to know contents).

28.  Once an employer establishes a prima facie case, the burden shifts to the defendants to show that the restriction is "overbroad, overlong, or otherwise not reasonably necessary to protect" the interests of the employer. North American Products, 196 F.Supp.2d at 1228; Fla. Stat. § 542.335(1)(c).

29.  The defendants do not dispute that a six month non-compete period is reasonable.  See also Fla. Stat. § 542.335(1)(d)(1) (presumed reasonable).

30.  The defendants contend that the scope of the Non-Compete Agreements is overly broad, because it prevents a former employee "from working for a competitive business in any capacity on a global scale," and it prohibits working with any Office Depot customer, regardless of whether the former employee had any relationship with that customer.  (Doc. 66, at 33-34.)

31.  Under the Florida statute, a protectable "legitimate business interest" includes: "Substantial relationships with specific prospective or existing customers, patients, or clients."  Fla. Stat. § 542.335(1)(b).  Under the statutory language and Florida case law, "the proper inquiry focuses on the relationship between an employer and its prospective and existing customers; an employer need not prove that its former employee himself had a substantial relationship with any particular customer."  Milner, 377 F.Supp.2d at 1218.

32.  The defendants argue that an order restraining Kyle and Lavelle in their former geographic territory "would significantly harm Kyle and Lavelle, such that they would suffer a total loss in income."  (Doc. 66, at 22.)  However, under Florida law, this court "[s]hall not consider any individualized economic or other hardship that might be caused to the person against whom enforcement is sought."  Fla. Stat. § 542.335(1)(g)(1); North American Products, 196 F.Supp.2d at 1231.

33.  As mentioned earlier, Lavelle's Non-Compete Agreement specifies that it "will be enforced to the fullest extent permitted by the law of [Ohio]."  JX 53, ¶ 3(c).

34.  Under Ohio law, "a covenant not to compete must not impose undue hardship on the employee."  Cintas v. Perry, No. 03-C-8404, 2004 WL 2032124, at *14 (N.D.

35

Ill. Aug. 20, 2004).  The Cintas court found the covenant at issue "unduly harsh" because of a broad restriction on competitive employment.  Id. at *15.

35.  The Florida statute (which otherwise governs by operation of the choice of law clause), by contrast, specifically directs that this court "[s]hall not consider any individualized economic or other hardship that might be caused to the person against whom enforcement is sought."  Fla. Stat. § 542.335(1)(g)(1); North American Products Corp. v. Moore, 196 F.Supp.2d 1217, 1231 (M.D. Fla. 2002).  The court will address whether this apparent conflict will limit the enforcement of the Non-Compete Agreement against Lavelle.

36.  In Raimonde v. Van Vlerah, the Supreme Court of Ohio stated that, in determining the validity of a covenant not to compete, "each case must be decided on its own facts."  Raimonde v. Van Vlerah, 42 Ohio St.2d 21, 25, 325 N.E.2d 544, 547 (1975).  In Raimonde, the court overruled existing precedent, and adopted a rule of reasonableness.  Raimonde, 42 Ohio St.2d at 21, 325 N.E.2d at 544-545 (syllabus).

37.  Under Raimonde, if a covenant imposes an unreasonable restriction, the court can modify it to the extent necessary to protect the employer's legitimate interest, and then enforce the covenant as modified.  MP TotalCare Services, Inc. v. Mattimoe, 648 F.Supp.2d 956, 963 (N.D. Ohio 2009); National City Corp. v. Boyd, No. 1:08CV2189, 2008 WL 4346444, at *4 (N.D. Ohio Sept. 17, 2008).

36

38.  The Cintas court stated that, if the covenant at issue was enforced, the defendant "is essentially prohibited, for a period of two years[5], from being employed in any managerial or professional capacity by, or consulting for, any company that is also in the identify uniform business."  Cintas, 2004 WL 2032124, at *15.  The court noted that "sales is not a 'unique profession,'" and the defendant could still use his managerial or sales skills in a variety of other industries without violating the covenant.  Id.  See generally Rogers v. Runfola & Assoc., Inc., 57 Ohio St.3d 5, 8, 565 N.E.2d 540, 544 (1991) (court reporting as "unique profession" was factor in unreasonableness).  "On the other hand, [the defendant] has been employed in the identity uniform business for eleven of the fourteen years of his professional career."  Id.

39.  Lavelle's sales experience is neither so extensive, nor so specialized, as the defendant's in Cintas.  Lavelle began his career is sales in August 2004, at New York Life.  (JX 54.)  After fourteen months there, he went to Guide Book Publishing in October 2005.  Id.  In neither of those positions was he selling office supplies.  He was hired by Office Depot in April 2006, and left for Impact in early June 2009.  Thus, at the time his Non-Compete would have come into effect (June 2009), Lavelle had a total of less than five years of sales experience.  Of that, slightly over

---

[5]  Under Ohio law, the six month time period here would not be problematic. In upholding a covenant enforceable for two years, the Sixth Circuit explained that "[n]umerous Ohio state courts have upheld covenants that extended for three to five years, finding that a covenant of five years is not per se unreasonable."  Chicago Title Ins. Corp. v. Magnuson, 487 F.3d 985, 998 (6th Cir. 2007) (citing cases).

three years consisted of selling office supplies.  This does not compare with the eleven year specialized career at issue in Cintas.

40.  "A determination that a covenant is unduly harsh requires a much greater standard than determining whether the covenant is merely unfair."  Cintas, 2004 WL 2032124, at *14; Marietta Therapy Assoc., Inc. v. Boles, No. 88 CA 35, 1989 WL 159018, at *3 (Ohio Ct. App. Dec. 29, 1989).  The court in Marietta Therapy discussed this element:  "To be sure, any person who is prevented from practicing his profession or trade for a period of time in an area in which it has been practiced, suffers some hardship. However, the Raimonde test requires more than just some hardship."  Marietta Therapy, 1989 WL 159018, at *3.  The court does not find that the application of the Non-Compete Agreement to Lavelle would result in undue hardship.

41.  Because Ohio law clearly allows modification of any "overbroad" provisions which might exist in the Non-Competes, defendants' argument that the non-compete provision is "not enforceable" because it is overbroad is incorrect.

42.  The defendants also argue that Kyle and Lavelle's customers would suffer harm in that they require service to address issues and problems.  (Doc. 66, at 22.)  Like any employer, Impact has methods for covering accounts when the account rep is unavailable, as for example, on medical leave.  (Doc. 62, Tr., at 881, 861.)

43.  Moreover, Florida courts do not hesitate to enforce non-compete agreements against both the employees who signed the agreements as well as against the

38

defendant employer, even where the employees were the only signatories to the non-compete agreements.  North American Products, 196 F.Supp.2d at 1229.

44.  The defendants have failed to carry their burden to show that the restrictive covenants are "overbroad, overlong, or otherwise not reasonably necessary to protect" the interests of Office Depot.

45.  The defendants assert that the breach of contract claim is barred by the doctrine of waiver.  (Doc. 66, at 37-39.)

46.  Both Non-Compete Agreements provide that the "Agreement may be amended or waived only with the prior written consent of the Company and Employee, and no course of conduct or failure or delay in enforcing the provisions of the Agreement shall affect the validity, binding effect or enforceability of this Agreement."  (JX 3 and 53, at ¶ 13).

47.  Waiver is defined as "an intentional relinquishment or abandonment of a known right or privilege."  Blanton v. Florida, 978 So.2d 149, 155 (Fla. 2008); see also American Logistics Grp, Inc. v. Weinpert, No. 85041, 2005 WL 2240987, at *5 (Ohio Ct. App. Sept. 15, 2005).

48.  Although waiver can be implied from conduct under certain circumstances, conduct is not held to constitute a waiver unless it does so clearly.  Aspen Investments Corp. v. Holzworth, 587 So.2d 1374, 1377 (Fla. Dist. Ct. App. 1991); Fireman's Fund Ins. Co. v. Vogel, 195 So.2d 20, 24 (Fla. Dist. Ct. App. 1967); see also American Logistics Group, 2005 WL 2240987, at *5; Sandler v. AII Acquisition

Corp., Inc., 954 F.2d 382, 385 (6th Cir. 1992) (party's actions must demonstrate unequivocal intent to waive).

49.  Although the defendants argue that there were instances of some Office Depot employees who left, and subsequently competed in (tangentially) related fields, without being held to a non-compete agreement, they did not provide an example comparable to the case before this court:  two of the best salespeople in the region leaving for a direct competitor.

50.  The court does not find that Office Depot's conduct constitutes a clear waiver of its right to enforce the Non-Compete Agreements at issue against Kyle and Lavelle.

51.  Once Office Depot has established one or more "legitimate business interests" justifying the restriction, which the court finds it has, irreparable injury is presumed and the burden shifts to Kyle and Lavelle to establish the absence of such injury.  North American Products, 196 F.Supp.2d at 1228 (citing Fla. Stat. § 542.335(1)(j)); Environmental Serv., 9 So.3d at 1262.

52.  The defendants argue that "any damages Office Depot has suffered are only economic and easily quantifiable."  (Doc. 66, at 42.)

53.  Florida court have rejected the argument that there is no irreparable harm because plaintiff's damages, if any, can be subject to a monetary judgment, finding it "without merit and has been rejected by other courts, where, as here, there is a statutory presumption of irreparable harm."  North American Products, 196 F.Supp.2d at 1231.

54.  The defendants argue that the requested preliminary injunction would substantially harm third parties, specifically, Impact's customers.  (Doc. 66, at 42-43.)  As mentioned earlier, Impact has methods for covering accounts when the account rep is unavailable.  (Doc. 62, Tr., at 881, 861.)  More importantly, customers would be able to procure office supplies and services from a variety of stationers, vendors, and superstores which supply these products.

55.  The defendants contend that the injunctive relief would not serve the public interest.  They assert that the public interest is not served by restricting free and open competition.  (Doc. 66, at 43.)  Under Florida law, on the contrary, the public has an interest in the enforcement of restrictive covenants.  North American Products, 196 F.Supp.2d at 1231.

56.  Finally, the defendants argue that the breach of contract claim is barred by the doctrine of laches.  (Doc. 66, at 36-37.)  They contend that it was not until months after their departure that Kyle and Lavelle received the cease-and-desist letter.  "During that entire five month period, however, Office Depot knew Kyle and Lavelle were competing against it."  Id. at 37.  Thus, they claim that Office Depot had unreasonably delayed enforcing its contract rights.  Id.

57.  Laches is an omission to assert a right for an unreasonable and unexplained length of time, under circumstances prejudicial to the adverse party.  Miami-Dade County v. Fernandez, 905 So.2d 213, 216 (Fla. Dist. Ct. App. 2005); Ticktin v. Kearin, 807 So.2d 659, 663 (Fla. Dist. Ct. App. 2001).  "Delay alone in asserting a right does not constitute laches, and the burden is on the party who asserts the

41

doctrine of laches to prove prejudice."  Ticktin, 807 So.2d at 663.  The prejudicial harm is not merely that a party loses what he might otherwise have kept, "but that the delay has subjected him to a disadvantage in asserting and establishing his claimed right or defense."  Molnar v. Gulfcoast Transit Co., 371 F.2d 639, 642 (5th Cir. 1967).

58.  The court finds that laches does not bar Office Depot's claims.  The delay here was not unreasonable, and was in part explained by the subterfuge employed by Kyle and Lavelle, and their surreptitious defection to Impact.[6]  Not only were they less than forthright about their destination upon leaving Office Depot, but the loss of two major salespersons in one week undoubtedly left the remaining staff at Office Depot under considerable distraction and stress.  The relatively brief delay does not affect the defendant's ability (through lost witnesses or documents, fading memories, etc.) to establish their defense.  The fact that the delay probably allowed the defendants to accumulate more of Office Depot's customers hardly constitutes a prejudice to the defendants.

59.  The court finds that Office Depot has a substantial likelihood of success on the breach of contract claims concerning the Non-Compete Agreements.

60.  The Non-Compete Agreements are valid restrictive covenants under Florida law which were intended to provide reasonable protection to the legitimate business

---

[6]  Of course, the court does not imply that they had any legal duty to inform Office Depot of their intention to work at Impact, only that it would not be equitable to apply the doctrine of laches under the factual circumstances here.

interests of Office Depot, including their trade secrets, valuable confidential business information that otherwise does not qualify as trade secrets, and substantial relationships with specific prospective or existing customers.

61.  The court finds that Kyle and Lavelle violated the reasonable six-month non-compete and non-solicit provisions of the Non-Compete Agreements concerning substantial relationships with specific prospective or existing Office Depot customers, by working for a direct competitor in northeast Ohio, Impact Office Products, and soliciting dozens of Office Depot customers, converting many to Impact, within six months of their employment at Office Depot.

62.  Under Florida law, a "trade secret" is defined as

> . . . information, including a formula, pattern, compilation, program, device, method, technique, or process that: (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Fla. Stat. §§ 688.002(4); 542.335(1).  See generally Ohio Rev. Code § 1333.61(D).

63.  The court finds that Office Depot has not established that Kyle and Lavelle violated their Non-Compete Agreements concerning "trade secrets" as defined under Florida law.  The joint stipulation, and the evidence presented during the hearing, established that much of the information at issue could not be characterized as deriving independent value from not being generally known or readily ascertainable within the industry.

43

64.  However, trade secrets are not the only protectable information under the statute.  The court does find that the evidence showed that Kyle and Lavelle violated the Non-Compete Agreements by spiriting away valuable confidential business or professional information that otherwise does not qualify as trade secrets.  See, e.g., American Resid. Serv., Inc. v. Event Tech. Serv., Inc., 715 So.2d 1048, 1049 (Fla. Dist. Ct. App. 1998) (citing Fla. Stat. § 542.335(1)(b)(2)).

65.  The defendants have not carried their burden to overcome the presumption of irreparable injury which arises upon violation of an enforceable restrictive covenant.  North American Products, 196 F.Supp.2d at 1228 (citing Fla. Stat. § 542.335(1)(j).)  The court finds that the preliminary injunction requested would not substantially harm third parties, and, under Florida law, the public interest would be served by issuing the preliminary injunction.  North American Products, 196 F.Supp.2d at 1231.

66.  This temporary injunction shall not be entered into force until Office Depot, as the party seeking enforcement of a restrictive covenant, gives a proper bond, and the court shall not enforce any contractual provision waiving the requirement of an injunction bond or limiting the amount of such bond.  See generally Fla. Stat. § 542.335(1)(j).

BOND

Pursuant to Civil Rule 65(c) and Fla. Stat. § 542.335(1)(j), no preliminary injunction should issue without the giving of security by the applicant sufficient for

payment of costs and damages as may be incurred or suffered by any party to have been wrongfully enjoined.

Accordingly, in order for the injunction to be effective the Plaintiff will be required to file an injunction bond in the amount of $150,000 with the Court in a form to be approved by the Clerk of the Court in order to compensate the Defendants should it later be determined that the preliminary injunction should not have been entered.

<u>RECOMMENDATION</u>

In view of the foregoing, it is respectfully RECOMMENDED that the motion for a preliminary injunction (Doc. 2) be GRANTED in part, and be DENIED in part, and that the Court enter a preliminary injunction enjoining Patrick Lavelle, Brian Kyle, and Impact Office Products, LLC, as follows:

(1) Prohibiting Kyle and Lavelle, for a period of six months from the date of this Order, from soliciting or servicing customers of Office Depot or potential customers of Office Depot solicited by Kyle, Lavelle or other Office Depot employees with Kyle and/or Lavelle's knowledge;

(2) Prohibiting Kyle and Lavelle from being employed by or performing services on behalf of Impact, within the Northeast Ohio territory, (defined as an area bounded by the Ohio state line on the east, I-70 on the south, US-23 on the west [but NOT including the City of Columbus, which shall be considered outside the prohibited territory], and Lake Erie on the north) for six months from the date of this Order;

(3) (a) Prohibiting Impact, for a period of six months from the date of this Order, from soliciting or servicing former customers of Office Depot converted by Kyle, Lavelle or other Office Depot employees with Kyle and/or Lavelle's knowledge within the geographic territory

46

defined above, where no contractual relationship exists with said

customers;  and,


(3) (b) Prohibiting Impact, for a period of six months from the date of

this Order, from renewing a contractual relationship with former

customers of Office Depot converted by Kyle, Lavelle or other Office

Depot employees with Kyle and/or Lavelle's knowledge within the

geographic territory defined above, where a contractual relationship

presently exists with said customers.


Dated:   Dec. 30, 2010               /s/ Kenneth S. McHargh
                                     Kenneth S. McHargh
                                     United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be filed with

the Clerk of Courts within fourteen (14) days of receipt of this notice.  Failure to file

objections within the specified time WAIVES the right to appeal the District Court's

order.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d

947 (6th Cir. 1981).